**RAND BOND OF NORTH AMERICA, INC., Plaintiff,**

v.

**SAUL STONE & COMPANY, Defendant.**

**No. 89 C 3495.**

United States District Court, N.D. Illinois, E.D.

Nov. 15, 1989.

Adrianne S. Harvitt, Harvitt & Gekas, Ltd., Chicago, Ill., for plaintiff.

Aaron E. Hoffman, Mathew D. Wayne, Schwartz & Freeman, Chicago, Ill., for defendant.

### MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Rand Bond of North America, Inc. ("Rand Bond") initially sued four defendants—Jack Rudman & Co. and Jack Rudman individually (collectively "Rudmans"), Saul Stone & Co. ("Stone") and T & S Commodities, Inc. ("T & S")[1]—in a multicount Complaint charging the several defendants with commodities fraud, negligence and breach of contract. Then Rand Bond's June 13, 1989 Amended Complaint

---

1. T & S is, according to the affidavit of Paul Toomey tendered by Rand Bond on the current motion (Toomey Aff. ¶ 7), not the same entity as C & S Commodities, referred to later in this opinion.

(the "Complaint") restated its claims against just Rudmans and Stone. Next Rudmans were dismissed out by agreement of the parties on August 21, leaving alive three counts against Stone only:

    1. Count I labeled "Fraud under the Commodities Exchange Act, 7 U.S.C., Section 6b";

    2. Count II captioned "Breach of Contract as Against Saul Stone & Company"; and

    3. Count IV headed "Negligence of Broker in Failure to Sell Silver Futures as Directed."

Now Stone has filed alternative motions seeking:

    1. dismissal of Count I under Fed.R. Civ.P. ("Rules") 9(b) and 12(b)(6) and Count IV under Rule 12(b)(6); or

    2. dismissal of the entire Complaint (and really of this action) based on an arbitration agreement between the parties.

For the reasons stated in this memorandum opinion and order Stone's motion for total dismissal is granted.

### Facts[2]

In April 1987[3] Rand Bond, a California corporation doing business in San Diego, was a customer of California broker C & S Commodities ("C & S").[4] In January of that year C & S had entered into an agreement with Stone under which the latter would act as the clearing firm for accounts of customers introduced by C & S.

On April 27 Rand Bond placed an order with C & S to sell 100,000 ounces of May silver futures at a stop order price of $9.20 per ounce. At 12:33 p.m. C & S placed that order to sell, not with Stone but directly with Rudmans, on the floor of the New York Commodities Exchange ("Comex"). Although May silver futures went through the stated stop order price several times and although several offers to purchase at or about said price were made openly on the Comex floor, Rudmans failed to execute Rand Bond's order. Neither Rudmans nor Stone informed Rand Bond of the failure to execute. By the time Rand Bond learned of that failure (about 1-½ hours later), it had to sell at the then market price: $7.60 an ounce. That sequence generated a $1.60 per ounce loss to Rand Bond —$160,000 in all.

Exactly the same thing happened that day to another Rand Bond order. It placed an order with C & S to sell 50,000 ounces of April silver futures at $8.28 or best per ounce. C & S also placed that sell order with Rudmans, who failed to execute it even though the price of April silver futures went through the order price several times. Again neither Rudmans nor Stone told Rand Bond of that failure, and Rand Bond was able to sell off those contracts too only at $7.60 an ounce—a loss of $.68 per ounce, totalling $34,000.

On May 4 Rand Bond entered into an entire set of agreements dealing with the arrangement among C & S, Stone and Rand Bond. Under the Introduced Customer Agreement, C & S was designated as the Introducing Broker and Stone as the Futures Commission Merchant for the purchase and sale of futures contracts based on Rand Bond's instructions to C & S, relayed in turn to Stone. One of the documents—expressly specified as *not* being a necessary condition of the parties' entry into the other agreements—was the Arbitration Agreement attached as Exhibit A to this opinion.

### Stone's Contentions

As already stated, Stone advances three contentions here, two targeting individual

---

**2.** Familiar Rule 12(b)(6) principles require this Court to accept as true all of Rand Bond's well-pleaded factual allegations, drawing all reasonable inferences in its favor (*Marmon Group, Inc. v. Rexnord, Inc.*, 822 F.2d 31, 34 (7th Cir. 1987)(per curiam)).

**3.** Because the relevant transactions took place that month, future references to dates will omit the year 1987.

**4.** C & S is described differently in the parties' submissions: sometimes as a California corporation and sometimes as a sole proprietorship. Just what kind of entity it is turns out to be irrelevant.

counts of the Complaint and the other directed against Rand Bond's entire action:

1. Count I assertedly fails to plead its fraud claim with the particularity required by Rule 9(b).

2. Rand Bond assertedly alleges nothing to establish an agency relationship between Stone and Rudmans—the necessary precondition to any liability on Stone's part under either Count I (fraud) or Count IV (negligence).

3. Because the Arbitration Agreement covers all the claims asserted by Rand Bond, this entire action should assertedly be dismissed.

This opinion deals with each argument in turn.

### Pleading Fraud Under Rule 9(b)

This Court, like many others, has often spoken of the interaction between Rule 9(b) —with its insistence on particularity—and Rule 8(a)—with its roots in the generality of notice pleading (see, e.g., *Flournoy v. Peyson*, 701 F.Supp. 1370, 1374–75 (N.D.Ill. 1988)). If this were a conventional fraud claim, Rand Bond's conclusory Count I allegations would plainly fail the test prescribed by the seminal decision in this Circuit, *Tomera v. Galt*, 511 F.2d 504, 508–09 (7th Cir.1975).

■ But Count I draws on a wholly different kind of "fraud"—what is called "commodities fraud" as a shorthand label for a claim under Commodities Exchange Act ("Act") § 4b, 7 U.S.C. § 6b. That statute includes (though of course it is not limited to) a kind of constructive fraud, in which the mere violation of statutory obligations by a regulated person is made the legal equivalent of the evil intent that is the hallmark of conventional fraud. To the CFTC, "the failure of an associated person or broker to execute an accepted order is fraudulent and in violation of Section 4b of the CE Act" (*Dizak v. ContiCommodity*

*Services, Inc.*, [1984–86 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 22,810, at 31,388 (CFTC 1985)). As *D.F.P. International, Inc. v. Hofmann, Kavanaugh Commodities Corp.*, [1977–80 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,775, at 23,180 (CFTC 1979) explains, such a failure is "fraudulent" because it "is legally indistinguishable from unauthorized trading."

Given that legal landscape, Rand Bond's pleadings do not run afoul of the Rule 9(b) particularity requirement. Count I sufficiently alleges the time (April 27), the place (Comex) and the contents of the fraud (failure to execute the orders)—the elements identified in *Tomera*.

### Agency Pleading

■ But that analysis bears only on *Rudmans'* potential liability to Rand Bond. Nothing in the Complaint alleges that *Stone* failed to execute any order placed with it or even that Stone knew of the orders placed with Rudmans. Instead Rand Bond advances purely conclusory allegations that Rudmans were agents of Stone (Complaint ¶¶ 8, 11 and 22).[5]

*Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir.1984) confirms the fundamental principle that governs Rule 12(b)(6) motions:

[C]onsideration of a motion to dismiss is limited to the pleadings.

As to the required content of those pleadings, *Car Carriers, id.* at 1106, quoting from *Sutliff, Inc. v. Donovan Cos.*, 727 F.2d 648, 654 (7th Cir.1984) and in turn from *In re Plywood Antitrust Litigation*, 655 F.2d 627, 641 (5th Cir.1981) confirms that:

In practice, "a complaint ... must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under *some* viable legal theory."

---

5. Rand Bond Mem. 8 (citations omitted) makes plain, in the commodities fraud context, its reliance on the agency concept as the predicate for Stone's liability:

A futures commission merchant such as Saul Stone is liable for violations of the commodities laws of its agent under Section 2(a)(1) of

the CEA, 7 U.S.C. § 4, even if the principal was not involved in the fraud.... Furthermore, an agency may be found where the purported agent's activities benefitted, even in part, the principal.

And *id.* at 9–10 makes the same type of argument as to the Count IV negligence claim.

Neither Count I's fraud claim nor Count IV's negligence claim fills the bill. Each depends on Rudmans' having acted as Stone's agent. Yet nothing in the Complaint sets out even the bare bones of an agency relationship in factual terms. All Rand Bond recites is the naked conclusion that Rudman was Stone's agent (Complaint ¶¶ 8, 22 and 22).[6]

But agency is a legal relationship whose existence flows from *facts*. And though federal practice involves a notice-pleading regime rather than the fact pleading demanded by Illinois courts (see, e.g., *Hofner v. Glenn Ingram & Co.*, 140 Ill.App.3d 874, 880, 95 Ill.Dec. 90, 94, 489 N.E.2d 311, 315 (1st Dist.1985)), it remains incumbent on the pleader to allege *some* factual predicate (even though generalized rather than evidentiary in nature) to create. the inference contained in Rand Bond's bald ."agency" assertions. No such facts have been alleged here, and consequently both Rand Bond's agency-based claims (those sounding in fraud and negligence) must be dismissed.[7]

### Arbitration

■ At this stage Complaint Counts I and IV have been dispatched only temporarily, subject to possible resuscitation if Rand Bond can make the necessary fact-based allegations in the objective good faith demanded by Rule 11. However, Count II (the breach-of-contract claim) stands untouched by any Rule 12(b)(6) attack. Hence this opinion turns to Stone's contention that this entire action is foreclosed by the parties' prior choice of arbitration for the resolution of their disputes.

Rand Bond counters that the Arbitration Agreement may not be enforced retroactively to compel arbitration of a dispute that had matured before the Agreement was signed. Stone is right and Rand Bond is wrong.

Although the entire Arbitration Agreement is annexed to this opinion, its operative language is focused in its first paragraph:

Any controversy or claim arising out of or relating to your accounts shall be settled by arbitration, either (1) under the Code of Arbitration of the National Futures Association, or (2) upon the contract market on which the disputed transaction was executed or could have been executed. Any award rendered thereon by the arbitrators shall be final and binding on each and all of the parties thereto and their personal representatives and judgment may be entered in any court having jurisdiction thereof. At the time you notify Saul Stone & Co. (the "Futures Commission Merchant") or C & S Comm. (the "Introducing Broker") of your intent to submit a claim to arbitration, or at such time as you are notified of an intent by the Futures Commission Merchant or the Introducing Broker to submit a claim to arbitration, you will have an opportunity to elect a qualified forum for conducting the proceedings, and will be supplied with a list of qualified organizations.

By its unambiguous terms that agreement extends to "[a ]ny controversy or claim" stemming from Rand Bond's accounts in which Stone has been the Futures Commission Merchant and C & S the Introducing

---

**6.** It should again be emphasized that this is purely a pleading ruling, not a substantive one. No account has been taken of what passes for an affidavit from Rand Bond's then Secretary, Paul Toomey ("Toomey"), which was prepared and tendered in an identical case Rand Bond had filed in the United States District Court for the Southern District of New York and was then also submitted with Rand Bond's responsive Memorandum here. If this were a Rule 56 motion (as it is not), Toomey's affidavit would not pass muster in evidentiary terms (see Rule 56(e)). But that calls for nothing more than passing mention at this point. As the next section of this opinion holds, it will be for the

arbitrator in the first instance, and not this Court, to sort out whether Rand Bond can deliver as Toomey advertises (Toomey Aff. ¶ 7 says only, "On information and belief, both T & S and Rudman were agents of Saul Stone, operating in New York").

**7.** This decision also obviates the need for this Court to determine whether, as Stone contends, *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443 (1982) and its progeny bar any tort action by Rand Bond for the purely economic loss asserted here.

Broker. It speaks in terms of relationships and not timing.

Only a moment's analysis is needed to demonstrate the poverty of Rand Bond's position. Given the timing of the transactions sued on here (April 27) and the Arbitration Agreement (May 4, one week later), there are two alternative possibilities:[8]

1. During the week intervening between the disputed trades (or more accurately non-trades) and the signing of the Arbitration Agreement, Rand Bond was aware of and had asserted its contention that Stone was somehow responsible for the C & S–Rudmans failures to execute.

2. It was only after the May 4 execution of the Arbitration Agreement that Rand Bond sought to lay responsibility for its losses at Stone's doorstep.[9]

Either way Rand Bond's argument fails.

If the former alternative applies, Rand Bond entered into the Arbitration Agreement, with its all-embracing language (after all, if Rand Bond is right the dispute certainly relates to its "accounts" with Stone), without voicing the slightest reservation or qualification. Whether parties have agreed to arbitrate is a matter of contract law (see *Shearson/American Express Inc. v. McMahon*, 482 U.S. 220, 225–

26, 107 S.Ct. 2332, 2337, 96 L.Ed.2d 185 (1987)). And as *Fischer v. New York Stock Exchange*, 408 F.Supp. 745, 749 (S.D. N.Y.1976)(citations omitted) puts it:

> If, once a controversy has arisen, a party voluntarily submits to arbitration, he is bound by his decision.[10]

And if the second (and seemingly more plausible) alternative applies, Rand Bond's retroactivity argument vanishes entirely. What is involved is a straightforward assertion of a controversy or claim concerning what—by Rand Bond's lights—is Rand Bond's account with Stone. That comes squarely within the unconditional scope of the Arbitration Agreement.

Thus the parties must be remitted to the arbitration remedy they themselves have chosen, whatever the facts might disclose. But even that level of speculation and parsing of possibilities is unnecessary. Whether the arbitrability of the disputes involved is a function of federal or state law (a question this Court need not resolve), the answer is the same. Under the Federal Arbitration Act (9 U.S.C. §§ 1–14) questions of arbitrability are for the court, with any doubts as to scope of arbitrability to be resolved in favor of arbitrability (*Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)). This Court has indeed

---

**8.** This Court must be pardoned for such bifurcated treatment, but in the current posture of the case the facts have not of course been set out by the parties. As the text demonstrates, that makes no difference.

**9.** Though this is admittedly speculative, that would seem the more likely scenario. It would appear passing strange for a customer, burned to the tune of nearly $200,000 a week earlier, to have then entered, with no apparent reluctance, into the formal account relationship evidenced by the various documents.

**10.** [Footnote by this Court] In light of the unequivocal language of the Arbitration Agreement, Rand Bond cannot rely on post hoc assertions of mental reservations such as that expressed in Toomey Aff. ¶ 14 (where he says "Rand–Bond did not intend that the Arbitration Agreement apply retroactively"). Judge Learned Hand's classic "twenty bishops" statement of three-fourths of a century ago remains vital today (*Hotchkiss v. National City Bank of New York*, 200 F. 287, 293 (S.D.N.Y.1911), *aff'd*,

201 F. 664 (2d Cir.1912), *aff'd*, 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115 (1913)):

> Moreover, it is of no consequence for another and deeper reason: A contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent. If, however, it were proved by twenty bishops that either party, when he used the words, intended something else than the usual meaning which the law imposes upon them, he would still be held, unless there were some mutual mistake, or something else of the sort. Of course, if it appear by other words, or acts, of the parties, that they attribute a peculiar meaning to such words as they use in the contract, that meaning will prevail, but only by virtue of the other words, and not because of their unexpressed intent.

resolved any doubts that might arguably exist in that way. And under state law the issue of arbitrability would be for the arbitrator in the first instance (see, e.g., *Donaldson, Lufkin & Jenrette Futures, Inc. v. Barr*, 124 Ill.2d 435, 447–48, 125 Ill.Dec. 281, 285–287, 530 N.E.2d 439, 443–45 (1988)). Thus all roads lead to the same destination—a decision in the first instance by an arbitrator to be chosen by the parties.

### Conclusion

Counts I and IV as now pleaded succumb under Rule 12(b)(6) analysis. But the effect of that interim ruling is essentially mooted in longer-range terms by the parties' choice of an arbitral rather than judicial forum for the resolution of their disputes. This action is dismissed in order that the parties may proceed to their remedy at arbitration.

## APPENDIX
## EXHIBIT A

### ARBITRATION AGREEMENT

Any controversy or claim arising out of or relating to your accounts shall be settled by arbitration, either (1) under the Code of Arbitration of the National Futures Association, or (2) upon the contract market on which the disputed transaction was executed or could have been executed. Any award rendered thereon by the arbitrators shall be final and binding on each and all of the parties thereto and their personal representatives and judgment may be entered in any court having jurisdiction thereof. At the time you notify ⟨Saul Stone & Co⟩ (the "Futures Commission Merchant") or ⟨C + S Comm.⟩ the "Introducing Broker") of your intent to submit a claim to arbitration, or at such time as you are notified of an intent by the Futures Commisison Merchant or the Introducing Broker to submit a claim to arbitration, you will have an opportunity to elect a qualified forum for conducting the proceedings, and will be supplied with a list of qualified organizations.

Notice of your intent to arbitrate shall be sent by certified mail to the Futures Commission Merchant and the Introducing Broker at their respective addresses, and the Secretary of the National Futures Association.

THREE FORUMS EXIST FOR THE RESOLUTION OF COMMODITY DISPUTES: CIVIL COURT LITIGATION, REPARATIONS AT THE COMMODITY FUTURES TRADING COMMISSION (CFTC) AND ARBITRATION CONDUCTED BY A SELF-REGULATORY OR OTHER PRIVATE ORGANIZATION.

THE CFTC RECOGNIZES THAT THE OPPORTUNITY TO SETTLE DISPUTES BY ARBITRATION MAY IN SOME CASES PROVIDE MANY BENEFITS TO CUSTOMERS, INCLUDING THE ABILITY TO OBTAIN AN EXPEDITIOUS AND FINAL RESOLUTION OF DISPUTES WITHOUT INCURRING SUBSTANTIAL COSTS. THE CFTC REQUIRES, HOWEVER, THAT EACH CUSTOMER INDIVIDUALLY EXAMINE THE RELATIVE MERITS OF ARBITRATION AND THAT YOUR CONSENT TO THIS ARBITRATION AGREEMENT BE VOLUNTARY.

BY SIGNING THIS AGREEMENT, YOU: (1) MAY BE WAIVING YOUR RIGHT TO SUE IN A COURT OF LAW; AND (2) ARE AGREEING TO BE BOUND BY ARBITRATION OF ANY CLAIMS OR COUNTERCLAIMS WHICH YOU, THE FUTURES COMMISSION MERCHANT, OR THE INTRODUCING BROKER MAY SUBMIT TO ARBITRATION UNDER THIS AGREEMENT. YOU ARE NOT, HOWEVER, WAIVING YOUR RIGHT TO ELECT INSTEAD TO PETITION THE CFTC TO INSTITUTE REPARATIONS PROCEEDINGS UNDER SECTION 14 OF THE COMMODITY EXCHANGE ACT WITH RESPECT TO ANY DISPUTE WHICH MAY BE ARBITRATED PURSUANT TO THIS AGREEMENT. IN THE EVENT A DISPUTE ARISES, YOU WILL BE NOTIFIED IF THE FUTURES COMMISSION MERCHANT OR THE INTRODUCING BROKER INTENDS TO SUBMIT THE DISPUTE TO ARBITRATION. IF YOU BELIEVE A VIOLATION OF THE COMMODITY EXCHANGE ACT IS INVOLVED AND IF YOU PREFER TO REQUEST A SECTION 14 "REPARATIONS" PROCEEDING BEFORE THE CFTC, YOU WILL HAVE 45 DAYS FROM THE DATE OF SUCH NOTICE IN WHICH TO MAKE THAT ELECTION.

IF YOU SEEK REPARATION PROCEEDINGS BEFORE THE CFTC AND THE CFTC DECLINES TO INSTITUTE THOSE PROCEEDINGS, OR IF CERTAIN ASPECTS OF THE CLAIM OR GRIEVANCE ARE NOT SUBJECT TO THE REPARATION PROCEEDINGS, THE CLAIM OR GRIEVANCE, OR PART THEREOF, WILL BE SUBJECT TO THIS ARBITRATION AGREEMENT.

YOU NEED NOT SIGN THIS AGREEMENT TO OPEN AN ACCOUNT WITH THE FUTURES COMMISSION MERCHANT AND THE INTRODUCING BROKER. SEE 17 CFR ¶ 80.1–80.5.

Dated: ___5/4/87___

X ___[signature]___
Signature of Customer

___[signature]___
If this is a Joint Account, all persons must sign