**Edward M. HENDRICK, Plaintiff,**

v.

**BROWN & ROOT, INC., et al., Defendants.**

No. Civ.A. 3:98cv698.

United States District Court, E.D. Virginia, Richmond Division.

June 3, 1999.

Robert S. Parker, Richmond, VA, for plaintiffs.

Joan E. Evans, United States Attorney's Office, Richmond, VA, Stuart D. Gibson, United States Department of Justice, Washington, DC, for defendants.

1. Hendrick was employed by a Brown & Root affiliated subsidiary but the distinction is ir-

## MEMORANDUM OPINION

PAYNE, District Judge.

Edward M. Hendrick filed this action against his former employer, Brown & Root, Inc., seeking damages for the company's unlawful use of Hendrick's name. Brown & Root has moved to dismiss the action or to stay it and compel arbitration of the claims which it presents. Although the title of the motion includes dismissal as a requested remedy, the motion addresses substantively only whether, pursuant to the Federal Arbitration Act ("FAA") and Brown & Root's Dispute Resolution Plan ("DRP"), the action must be stayed pending arbitration of the dispute which is the subject of the Complaint. For the reasons which follow, the motion to stay the action and compel arbitration is denied.

## STATEMENT OF FACTS

Resolution of this motion requires an understanding of the history of Hendrick's employment with Brown & Root and the several employment contracts between Hendrick and the company. Also, it is necessary to appreciate the nature of Hendrick's claims against Brown & Root. Hence, those topics require brief explanation.

### 1. The Employment History and the Contracts

Hendrick is a Master Electrician and, by virtue of that status, he is specially licensed as an expert in the trade of electrical work by Virginia's Department of Professional and Occupational Regulation. Hendrick was employed by Brown & Root, a construction company with national and international operations, on a project-by-project basis on four different occasions.[1] The first employment period was from October 30, 1980 to March 25, 1982; the second was from February 25, 1985 to September 18, 1986; the third was from October 19, 1988 to May 20, 1993 and the

relevant here and thus the employer is identified throughout as Brown & Root.

final employment period was from September 27, 1993 to September 8, 1995.

Hendrick was hired pursuant to a different contract for each period of employment and, pursuant to those contracts, Hendrick was hired for separate and distinct projects. On each occasion, he was treated as a new employee; and, therefore, each time he was hired, Hendrick was required to submit a new job application and to complete new tax and other personnel forms. Each period of employment was formally terminated in writing and Brown & Root processed termination forms which made clear that Hendrick was no longer entitled to compensation, medical coverage and other benefits. As is evident from each of the four employment contracts, Hendrick was an at-will employee and then only for the particular assignment for which he was hired under the operative employment contract.

For the third period of employment (October 19, 1988 to May 20, 1993), Hendrick was hired to work, and in fact worked, as a Master Electrician on the so-called Normex building project at a vast chemical manufacturing complex owned by E.I. du-Pont de Nemours and known as the Spruance Plant.[2] It is undisputed that the employment contract which governed the third period of Hendrick's employment with Brown & Root did not require arbitration of employment disputes. In fact, when that contract was executed, Brown & Root had not established its DRP.

However, by letter dated May 1, 1993 (nineteen days before the third period of employment was terminated) Brown & Root notified its employees that, effective

as of June 15, 1993 (twenty-five days after the third employment was terminated), the company would adopt the DRP which would apply "to all potential employee disagreements." The letter provided a brief introductory overview of the DRP and made reference to an "enclosed brochure" which explained the DRP and its procedures in detail. The letter also notified employees that, after June 15, 1993, all companies within the Brown & Root organization and their respective employees would be "bound to use the Dispute Resolution Program as the primary and sole means of dispute resolution." The letter concluded with the following notification:

... This means that after June 15, 1993, your decision to accept employment or continue your current employment will mean that you have agreed to and are bound by the terms of the Program as contained in the plan document and rules (enclosed).

Ltr. from Brown & Root to all U.S. Employees, p 2 at ¶ 8 (May 1, 1993).[3] The DRP applies to "the Company and its present and former employees." In a section entitled "Application and Coverage," the DRP provides:

Until revoked by [Brown & Root] pursuant to this plan, this Plan applies to and binds the Company, each Employee who *is in the employment of the Company on or after the effective date of this plan* and [all heirs and assigns] ...

\*　　\*　　\*　　\*　　\*　　\*

Except as provided for herein, this Plan applies to *any legal or equitable claim, demand or controversy in tort*, in

---

**2.** *See* Pl.Mo.Op. at 3. Brown & Root does not deny that, during the third period of employment, Hendrick was hired for, and only performed services at, the Normex project. Rather, for reasons neither explained or readily apparent, Brown & Root disputes that "the fact that [Hendrick] was hired to work on a particular project has any relevance to the motion before [the] Court." Trans. at 18:21–23 (Feb. 22, 1999).

**3.** Hendrick avers that he never received the May 1993 notification respecting the DRP.

Brown & Root has proffered copies of the mailing list used by the company to forward copies of the letter and brochure. Hendrick's correct name and mailing address appears on this list. In any event, even if Hendrick received the notification, there is no dispute that he was terminated before the effective date of the DRP. Thus, by the explicit terms of the May 1993 notification, Hendrick's 1988 employment contract was not modified to incorporate the DRP because he was no longer employed under that contract when the DRP became effective.

contract, *under statute* or alleging violation of any legal obligation between persons bound by this plan which *relates to, arises from, concerns or involves in any way:*

(1) this Plan;

(2) *the employment* of any Employee, including the terms, conditions or termination of such employment;

(3) employee benefits or incidents of employment with the Company; or

(4) *any other matter related to the relationship between the Employee and the Company* including by way of example and without limitation, allegations of: discrimination based on race, sex, religion, national origin or disability, sexual harassment, workers compensation, retaliation, defamation, infliction of emotional distress, or status, claim or membership with regard to any employment plan.[4]

DRP at ¶ 3A–B (emphasis added).

On May 20, 1993, Brown & Root terminated the third employment contract and Hendrick's employment on the Normex project ended. Thus, Hendrick was not employed by Brown & Root on June 15, 1993, the effective date of the DRP.

On September 27, 1993, Hendrick again was hired by Brown & Root. This time he was hired to perform electrical work on a project unrelated to the Normex project. Hendrick once again executed an employment contract and again he was required to submit to a new physical examination, drug testing and to complete new tax and personnel forms. The 1993 employment contract requires submission of covered disputes to arbitration by virtue of a single sentence which incorporates by reference the provisions of the DRP.

In November 1994, Brown & Root mailed a cover letter and DRP brochure to all employees as a reminder that continued employment with the company was contin-

gent upon agreement to resolve all disputes through the DRP. Hendrick's name and correct address appears on the employee list used for the November 1994 dissemination of these documents. Hendrick continued to work for the defendant until September 8, 1995, almost ten months later.

### 2. The Nature of Hendrick's Claims

On October 20, 1997, Hendrick filed this action against Brown & Root in state court seeking redress for the Company's unlawful use of his name and status as a licensed Master Electrician. One count asserts a tort claim for conversion of Hendrick's name; the other asserts the violation of Virginia Code § 8.01–40 for the wrongful use of Hendrick's name. Brown & Root timely removed the action to this Court.

The allegedly wrongful conduct by Brown & Root occurred at a time when Hendrick was in the third period of employment with the company (from October 19, 1988 to May 20, 1993). The gravamen of each count is that Brown & Root wrongfully, and without Hendrick's knowledge or consent, used Hendrick's name and status as a Master Electrician on two occasions to secure building permits from Chesterfield County.

It is undisputed that, under Virginia law, a Master is specifically licensed for a specific trade for which he has qualified as an expert and that Hendrick is licensed as a Master only in the electrical trade. By virtue of state law, building permits for work in a particular trade must be issued in the name of a Master who is responsible to the state, and who may be held personally liable to third parties, for the work done pursuant to the permit used in the Master's name.

It is undisputed that, on October 19, 1992 and January 23, 1993, respectively, Chesterfield County issued building permits for the installation of a sprinkler sys-

---

4. The parties have stipulated that the only sections of the DRP which arguably could apply to the claims advanced by Hendrick are paragraph (2) relating to "the employment" of an individual or the catch-all provision in paragraph (4).

tem and for plumbing work, both in Hendrick's name as the Master. Brown & Root admittedly applied for both permits. Hendrick did not know of, or consent to, the use of his name or status as a licensed Master to secure either permit. Likewise, there is no quarrel over the fact that both permits were issued for work at the so-called Tyvek Line 4 facility at the Spruance plant, a project on which Hendrick neither worked nor was authorized to work by the employment agreement which was in effect when the permits were applied for and issued. Finally, it is undisputed that neither permit was within the scope of the electrical Master's license held by Hendrick.

The parties dispute the facts and circumstances surrounding the issuance of these permits. Hendrick contends that Brown & Root performed the sprinkler and plumbing work on the Tyvek Line 4 project, and thereafter determined that it had no Master's license for the work which had been performed. Whereupon, to avoid contract delay penalties and state sanctions, Hendrick maintains that Brown & Root simply falsified the applications to obtain the permits issued in his name. This, according to Hendrick, left him open to personal liability and sanctions.

It is unclear how Brown & Root explains the issuance of the permits in Hendrick's name. The company, at one time, took the position that the permits were not issued in Hendrick's name. On another occasion, Brown & Root claimed that the error was that of the issuing authority, Chesterfield County. The resolution of those disputes are the focus of substantive liability on Hendrick's claims and they need not be further explicated at this stage of the proceedings.

When Hendrick signed the fourth employment contract, he did not know of Brown & Root's allegedly wrongful conduct.[5] The claims, if extant at all, had accrued on October 19, 1992 and January 23, 1993, respectively, before the third employment contract expired and before the fourth contract was executed.

## DISCUSSION

It is against the foregoing background that the motion to stay and compel arbitration under the provisions of the fourth contract between Hendrick and Brown & Root must be considered. Brown & Root urges that the fourth contract reaches back to make arbitrable claims which predate that contract and which accrued at a time when the controlling employment contract imposed no requirement to submit any disputes to arbitration. Hendrick asserts that the fourth contract does not by its terms reflect an agreement to arbitrate antecedent disputes and that, even if it were so construed, the dispute is not of the sort which the contract requires to be arbitrated.

### A. Governing Principles of the Federal Arbitration Act

■■■ The FAA, 9 U.S.C. §§ 1 *et seq.*, (1970 & Supp.1998), provides as follows:

A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, *shall be valid, irrevocable and enforceable, save upon such grounds as exist in law or equity for the revocation of any contract.*

*Id.* at § 2 (emphasis added). Thus, by its terms, the FAA requires the enforcement of arbitration agreements that: (1) are part of a written contract between the parties if the contract or transaction involves interstate commerce; (2) cover the

---

5. The current record does not reflect precisely when Hendrick learned of the alleged wrongful conduct by Brown & Root but he did not learn of it during the third period of employment or before commencing the fourth period of employment.

particular dispute at issue; and (3) are valid under general principles of contract law. *Id.*[6] Section 3 of the FAA requires federal courts to stay proceedings before them which present a controversy that the parties have agreed to arbitrate. Section 3 provides:

> If any suit or preceding be brought in any of the courts of the United States upon any issue referable to arbitration, the court in which such suit is pending, *upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration* under such an agreement *shall* on application of one of the parties *stay the trial of the action until such arbitration has been had* in accordance with the terms of the agreement . . .

*Id.* at § 3 (emphasis added). Section 3, therefore, serves as a substantial constraint on the exercise of federal jurisdiction by requiring the court to stay its hand and to force the parties to adhere to the mode of dispute resolution to which they, by mutual agreement, have bound themselves.

■ There is a presumption of sorts favoring arbitration. As the Supreme Court has put it:

> [W]here the contract contains an arbitration clause, there is a presumption of arbitrability *in the sense that* "[a]n order to arbitrate the particular grievance should not be denied *unless* it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage."

*AT & T Technologies, Inc. v. Communications Workers,* 475 U.S. 643, 650, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (emphasis added) (quoting *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582–83, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)). However, because the legal predicate of compulsory arbitration is contractual consent, courts can require arbitration only of those disputes which the parties have agreed to arbitrate. *Gateway Coal Co. v. United Mine Workers of America,* 414 U.S. 368, 374, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974); *Brown v. Trans World Airlines,* 127 F.3d 337, 340 (4th Cir.1997) (noting that "a party cannot be required to submit to arbitration any dispute which he has not agreed to so submit . . ."); *General Drivers Warehousemen and Helpers Local Union No. 509 v. Ethyl Corp.,* 68 F.3d, 80, 83 (4th Cir.1995).

■ Brown & Root, as the party seeking a stay and compulsory arbitration, has the burden to prove that the issue which it seeks to arbitrate is referable to arbitration under the contract. *See Carson v. Giant Food, Inc.,* 175 F.3d 325, 331 (4th Cir.1999). Of course, the scope and meaning of an arbitration provision is a matter to be determined by the court and, notwithstanding the presumption which favors arbitration, traditional and familiar rules of contract interpretation govern that inquiry. *See AT & T Technologies, Inc.,* 475 U.S. at 649, 106 S.Ct. 1415; *Champion Int'l Corp. v. United Paperworkers Int'l Union,* 168 F.3d 725, 728 (4th Cir.1999); *Local 637, Int.'l Bro. Of Elec. Workers v. Davis H. Elliot Co., Inc.,* 13 F.3d 129, 132

---

**6.** There is no dispute that the September 1993 contract is a "written agreement" between the parties. Nor does Hendrick argue that that contract is invalid under traditional principles of contract law.

Hendrick, however, does argue that the FAA does not apply because his performance of the employment contract did not involve production of goods for commerce or being engaged in an activity that affected commerce. While it may be true that Hendrick himself did not "engage" in interstate commerce in the sense that he did not physically traverse state lines, it can not be disputed that the work he performed for Brown & Root, a Texas based corporation, at the DuPont facility in Richmond, Virginia involved and affected interstate commerce. *See e.g. Allied–Bruce Terminix Co., Inc. v. Dobson,* 513 U.S. 265, 282, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995) (noting the "multi-state nature" of petitioner's business as evidence of a transaction involving interstate commerce.) Hence, Hendrick's argument to the contrary is rejected.

(4th Cir.1993); *Trans World Airlines*, 127 F.3d at 340.

 "Ordinary state-law principles that govern the formation of contracts" control the ascertainment whether there is an agreement to arbitrate and, if so, to what extent. *Johnson v. Circuit City Stores, Inc.*, 148 F.3d 373 (4th Cir.1998) (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995)). And, familiar contract principles require that ambiguities in unilaterally prepared contracts are to be resolved against the drafter. *See e.g., Gates, Hudson & Assoc., Inc. v. Fed. Ins. Co.*, 141 F.3d 500, 502 (4th Cir.1997); *Fuisz v. Selective Ins. Co. of America*, 61 F.3d 238, 242 (4th Cir.1995); *Doe v. Group Hospitalization & Med. Serv.*, 3 F.3d 80, 89 (4th Cir.1993); *Glocker v. W.R. Grace & Co.*, 974 F.2d 540, 544 (4th Cir.1992).[7]

 Of course, it also is well-settled that federal law favors arbitration and that "[t]he Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay or a like defense to arbitrability." *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). However, contrary to the view held by Brown & Root, the presumption applies only as to doubts respecting the scope of the agreement reached by the parties. It does not apply in resolving doubts respecting whether the parties have reached an agreement respecting what they will arbitrate. *Carson*, 175 F.3d at 328.

Thus, the presumption does not relieve Brown & Root of the obligation to prove that the language which it authored evinces an agreement to arbitrate pre-existing disputes. A contrary view would permit employers to insert general arbitration provisions in standard form employment contracts and then rely on the presumption to carry their burden of proving that the parties agreed to arbitrate pre-existing disputes. Nothing in *Mercury Construction* or its progenitor, *Warrior & Gulf*, 363 U.S. at 582–83, 80 S.Ct. 1347, permits, much less requires, the federal policy favoring arbitration to have such a result.

With those precepts in mind, it is appropriate now to assess the motion to stay and for compulsory arbitration.

## B. The Intent of the Parties to Arbitrate

The threshold issue is whether the fourth contract (and the incorporated DRP) evince an intent to arbitrate an employee's claims which had accrued before execution of the fourth contract. In that respect, it is well to remember that:

> While arbitration serves important public interests, an agreement to arbitrate—like any other contract—is fundamentally about private choice. "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to so submit." [And,] [d]espite the public benefits of arbitration, the determination of what disputes are arbitrable is focused on the intent of the parties.

*Carson*, at 327 (internal citations omitted).

The allegedly wrongful use of Hendrick's name occurred on October 19, 1992, and on January 21, 1993, when the permits for which Brown & Root applied in connection with the Tyvek 4 Project were issued. Under Virginia law, Hendrick's claims accrued on those dates; and, as of then, Hendrick was entitled to redress those wrongs in a judicial forum before a jury, if he so desired. The contract in effect on those dates had been executed on October 19, 1988; and, without doubt, it contained no agreement of the parties to submit any

---

7. Brown & Root's DRP, like its employment contract documents, are prepared by Brown & Root. Unlike commercial agreements between business entities or collective bargaining agreements, there is no negotiation over terms.

dispute to arbitration. And, the 1988 employment contract was not amended to incorporate the requirements of Brown & Root's DRP because Brown & Root terminated Hendrick's employment under that contract on May 20, 1993, twenty-five days before the DRP became effective on June 15, 1993.[8] Hence, at the time Hendrick's claims accrued, it can be said with certainty that it was not the intent of the parties to resolve those claims by arbitration.

Recognizing that the 1988 employment contract does not require (or permit) an order of arbitration, Brown & Root argues that the contract which Hendrick signed on September 27, 1993 requires the arbitration of the previously accrued claims for the allegedly wrongful use of Hendrick's name even though those claims arose under a previous period of employment and notwithstanding that, at the time the 1993 contract was signed, Hendrick had no knowledge of the conduct giving rise to those claims. The starting point for ascertaining the intent of the parties to agree to arbitrate pre-existing claims is the 1993 employment contract. It provides in relevant part as follows:

> In consideration of my employment, I agree that my assignment, job or compensation can be terminated with or without cause with or without notice at any time at the option of either the Company or myself. *I also agree that I will be bound by and accept as a condition of employment, the terms of the Brown & Root Dispute Resolution Program, which are herein incorporated by reference.* I also agree that any Employment Contract or any other agreement which is inconsistent with the provisions of this Assignment Authority or the Disputes Resolution Program is absolutely void unless entered into in writing by the Chief Executive Officer. *I further agree that I have been hired for the duration of this Project only and that I am subject to being laid off or reassigned at the Company's pleasure, at the completion of the project I have initially been employed for, or any other special project I may be assigned to in the future.* (emphasis added).

Although this provision is both lengthy and detailed respecting the binding nature of the DRP, it contains no language which provides for arbitration of claims which pre-date execution of the 1993 employment contract. Nor does the text of the DRP mention that it applies to claims which had accrued at a time when a former, and since expired, employment contract defined the obligations of both Brown & Root and Hendrick. Thus, it may be said with positive assurance that the words chosen by Brown & Root to evince the intent of the parties about what they were to arbitrate do not require arbitration of disputes which had accrued before the execution of the fourth employment contract between Hendrick and Brown & Root.

To avoid the consequence of that obvious textual deficiency in the contract and in the DRP, Brown & Root argues that, where, as here, the contract is silent respecting whether the parties have agreed that an arbitration provision will apply retroactively to bring pre-existing disputes within its reach, the agreement to arbitrate nonetheless has that result if, like the DRP here, the contract language broadly makes arbitrable "any" claim which relates to, arises from, concerns or involves the "employment of an employee" or "any other matter related to the relationship between the Employee and the Company." DRP at ¶¶ 3B(2) & H. For several reasons, that superficially appealing argument does not withstand scrutiny.

---

8. The DRP plainly states "employment or continued employment *after* the Effective Date [June 15, 1993] of this plan constitutes consent by both the Employee and the Company to be bound by this Plan both during the employment, and after termination of employment." DRP at ¶¶ 12, 15 (emphasis added). However, that provision does not operate retroactively to inject the agreement to arbitrate or the DRP into the 1988 contract which had been terminated before the DRP attained viability.

First, the argument is directly at odds with the rule that the presumption favoring arbitration applies only if there are doubts created by the contract language as to the intent of the parties. Where, as here, the contractual language does not evince an agreement to arbitrate pre-existing disputes, the presumption does not operate at all because there is no doubt presented by the text of the agreement.

Second, the Supreme Court has never held that an intent to arbitrate can be found from the absence of contractual language evincing an intent to arbitrate a particular kind of dispute. Rather, the Court has held that only doubtful interpretations of contractual language respecting the scope of the agreement to arbitrate certain kinds of disputes are to be resolved in favor of arbitration. To convert that principle into a rule that an employer may insulate itself from pre-existing claims by failing to say so in explicit terms is a fundamental distortion of the principle.

Third, the contractual language, fairly construed, does not point to the retroactive effect of the obligation to arbitrate. Brown & Root's principal contention is that the sweeping nature of the applicability section of the DRP[9] points both to its forward and retroactive effect. True, the word "any," like many other words in the applicability section, is very broad. But, none of the text of that section provides that the DRP reaches back in time to require an employee to arbitrate a claim which had accrued before the contract was signed or before the DRP even took effect.

Furthermore, to the extent that the 1993 employment contract and the DRP contain language bespeaking the temporal reach of the agreement to arbitrate, that language is forward-looking, not retroactive. For example, the contract provides that the employee "will be bound" to arbitrate under the DRP. And, even the words which Brown & Root says sweep the pre-existing claims within the agreement to arbitrate ("relates to," "arises from," "concerns or involves") speak in the present tense or connote the future ("arises from").

Of equal importance, the topics which are committed to arbitration point to incidents of employment which occur after the employment agreement is signed such as "the employment of any Employee, including the terms, conditions or termination of employment;" and "employee benefits or incidents of employment;" and "any other matter related to the relationship between the Employee and the Company." Nothing in that language even implies an obligation to arbitrate claims accrued before the commencement of the obligation to arbitrate.

▆▆ Brown & Root also argues that the words "former employee" in the DRP reflect an intent to arbitrate Hendrick's previously accrued claims for wrongful use of his name. DRP at ¶ 2F. That argument misses the mark because the contractual provision on which it is based simply means that the obligation to arbitrate survives the termination of the 1993 employment contract, if, of course, the dispute is one which the parties have agreed to arbitrate. And, that, of course, is consistent with the rule that, if the parties have agreed to arbitrate a kind of dispute, the obligation to arbitrate does not end with the termination of the agreement containing the arbitration obligation unless the agreement so provides. *See e.g., Nolde Bros. Inc. v. Local No. 358, Bakery & Confectionery Workers Union,* 430 U.S. 243, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977).

▆▆ Fourth, the interpretation of those words urged by Brown & Root would have an employee waive a vested right to judicial resolution of an accrued claim on the basis of silence in a contract drafted by his employer. That notion is flatly at odds with the precept that a waiver cannot occur unless there is a knowing and deliberate relinquishment of ·a right. *See e.g. Parkerson v. Federal Home Life Ins. Co.,* 797 F.Supp. 1308, 1309 (E.D.Va.1992); *see*

---

**9.** *See* DRP ¶¶ 3A–B, cited in text, *supra* at p. 530.

*also Employers Commercial Union Ins. Co. of America v. Great American Ins. Co.,* 214 Va. 410, 412–13, 200 S.E.2d 560, 562 (1973) (noting that under Virginia law a waiver requires "both knowledge of the facts basic to the exercise of the right and the intent to relinquish that right.") Knowing and deliberate relinquishment of an employee's right to choose the forum in which to litigate an accrued claim cannot be found merely from the fact that the employer's contract does not mention that execution of the contract waives the right to judicial resolution of pre-existing claims.

 Brown & Root has cited no authority which would alter the law of waiver to permit the result it seeks here. Nor could giving contractual silence such a significant effect be squared with the basic principle that a waiver must be clearly and knowingly effectuated.[10] Absent contractual language which clearly evinces an intent to foreswear the right to litigate an accrued claim and instead to arbitrate it, the requisite of a valid waiver cannot be satisfied.

Fifth, the authorities, *Zink v. Merrill Lynch Pierce Fenner & Smith, Inc.,* 13 F.3d 330 (10th Cir.1993) and *BG Balmer and Co., Inc. v. United States Fidelity and Guaranty Co.,* 1998 WL 764669 (E.D.Pa. 1998), upon which Brown & Root relies do not support the "my silence is your assent" rationale which Brown & Root here advances. Those decisions hold that, under certain circumstances, parties may be compelled to submit to arbitration disputes stemming from events which occurred before the parties entered into a particular arbitration agreement. Without doubt, parties to a contract may so agree, but the circumstances of both *Zink* and *Balmer* are quite different than those presented here.

In *Zink,* the plaintiff purchased a quantity of bonds in 1980. A financial account in his name was established in connection with that transaction and thereafter was managed continuously by the defendant. *Zink,* 13 F.3d at 331. Two years after the 1980 bond purchase, without any cessation in the business relationship, the parties executed a formal account agreement which included an arbitration clause that provided, in part, as follows: "It is agreed that any controversy between us arising out of your business or this agreement, shall be submitted to arbitration. .'. ." *Id.* The following year, the plaintiff instituted a civil action in federal court alleging various claims respecting the 1980 bond purchase. *Id.*

The Tenth Circuit observed that the arbitration agreement covered both the plaintiff's financial account and any dispute stemming from the plaintiff's business dealings with the defendant, and then held that the agreement was "clearly broad enough to cover the dispute at issue despite the fact that the dealings giving rise to the dispute occurred prior to the execution of the agreement." *Id.* at 332. The rationale for that decision is not readily apparent. However, when the operative text is read as a whole, it appears that the court, in *Zink,* gave the arbitration provision retroactive effect because the initial bond purchase was part and parcel of the ongoing business dealings between the parties. Thus, *Zink* cannot reasonably be construed to hold that, under all circumstances, a broadly worded arbitration agreement must be given retroactive effect. *Zink* does not apply here because the parties did not have an ongoing relationship under the 1988 employment contract. Moreover, whatever else may be said about *Zink* and the paucity of its reasoning, it does not hold that silence in a unilaterally drafted employment contract evinces an intent to arbitrate claims which pre-date the agreement to arbitrate.

---

**10.** Furthermore, on this record, it appears that, when Hendrick signed the 1993 Employment Contract, he did not know about the wrongful use of his name by Brown & Root. Thus, on this record, it could scarcely be said that Hendrick knew of the right which Brown & Root claims that he waived.

*Balmer* is likewise distinguishable from the facts in this action. There, the plaintiff was an independent agent of the defendant and, in that capacity, sold commercial and personal lines of insurance on behalf of the defendant. *Balmer,* 1998 WL 764669 *1. During the course of the agency arrangement, the parties signed a new agency agreement which, in relevant part, provided:

> If we cannot resolve any dispute or disagreement between us, the matter shall be decided solely by binding arbitration.
>
> \* \* \* \* \* \*
>
> [This Agreement] *supersedes and replaces any prior representations, understandings or agreements, whether written or oral, between the parties, including any prior agency agreement.*
> *Id.* at *3 (emphasis added).

Thereafter, the plaintiff filed suit on a claim arising out of events which occurred during the agency relationship, but before execution of the new agency agreement in which the parties agreed to arbitration. Because the dispute related to the plaintiff's continued performance as an agent of the defendant, and because the new agency agreement applied to any dispute arising between the parties, the court concluded that the parties had agreed to resolve the dispute through arbitration, notwithstanding the absence of specific language making the agreement to arbitrate retroactive. *See id.* at *4–5.

To justify that conclusion, the court, in *Balmer,* announced as a general premise of first impression, "that when an arbitra-

tion clause 'speaks in terms of relationships and not timing,' a dispute arising from the relationship between the parties is arbitrable even if the dispute arose before the agreement was signed." *Id.* at *5 (citing *Rand Bond of North America, Inc. v. Saul Stone & Co.,* 726 F.Supp. 684, 688 (N.D.Ill.1989) and relying on *Zink,* 13 F.3d at 332). Nothing in *Zink* or *Rand Bond* supports the expansive rule articulated in *Balmer.* In any event, as explained above, Hendrick and Brown & Root did not have a continuous relationship and thus .the broad pronouncement of *Balmer* is inapplicable, even if it is correct (which, with respect, it is not).[11] Moreover, the conclusion in *Balmer* that the agreement "spoke in terms of relationships" must be construed in perspective of the fact that, unlike the agreement here, there was in *Balmer* a clear expression of intent to modify previous agreements between the parties respecting their agency relationship to impose the requirement that disputes be submitted to arbitration.

 Furthermore, *Zink* and *Balmer,* if given the construction urged by Brown & Root, would run afoul of the basic principle that an arbitration agreement "may not be used to reach back to cover disputes arising before the agreement was executed, *unless such preexisting disputes are brought within the scope of the clause."* Peerless Importers, Inc. v. Wine, Liquor & Distillery Workers Union Local One,* 903 F.2d 924, 928 (2nd Cir.1990) (emphasis added) (citing *Warrior & Gulf Navigation Co.,* 363 U.S. at 582–83, 80 S.Ct. 1347). In

---

11. *Balmer* relies on *Zink* for the broad general rule which it articulates. *Zink* did not announce such a rule. Nor was it decided on the "relationship" theory attributed to it in *Balmer.* As explained above, it is difficult to discern the rationale of the decision in *Zink* but it seems to have turned on the fact that the agreement to arbitrate covered ongoing business transactions between the parties which included the purchase of the bonds at issue in *Zink.*

Similarly, in *Rand Bond,* also cited in *Balmer* as the basis for its far-reaching rule, the agreement provided for arbitration of "[any controversy or claim arising out of or relating

to your accounts]" and, at the time the arbitration agreement was executed, there was an ongoing account relationship between the parties. *Rand Bond,* 726 F.Supp. at 685. Also, before executing the arbitration agreement, the plaintiff had informed the defendant of the claim and had asserted that the defendant was liable on it. Thus, there was a factual basis in *Rand Bond* for concluding that the plaintiff had agreed to arbitrate preexisting claims. That simply is not so in this action. Hence, *Rand Bond* is not applicable here and, in any event, it certainly does not stand for the broad proposition for which *Balmer* cited it.

*Peerless,* an employee was discharged a few days before the company and a union executed a collective bargaining agreement which committed to arbitration, among other matters, employee discharges. Thereafter, the employee sought to arbitrate his discharge. The company argued that the employee was "discharged at a time when no collective bargaining agreement was in force and that the agreement the parties subsequently negotiated did not accord rights to employees involved in disputes that occurred [before the agreement was executed]." *Id.* at 928. The Second Circuit refused to allow arbitration of the employee's claim of unlawful discharge because the arbitration agreement did not bring the pre-existing disputes "within the scope of the clause." *Id.* Indeed, as the court noted, to have required arbitration of the dispute which pre-dated the arbitration agreement would have allowed "any former employee, no matter how long ago dismissed to demand 'reinstatement' under the term of the new collective bargaining agreement and obtain arbitration of the reinstatement 'dispute.' " *Id.*

To foreclose that clearly non-consensual arbitration, the Second Circuit held that an agreement could reach pre-existing disputes only if it so provided. In other words, absent a contractual manifestation of intent to arbitrate them, arbitration agreements do not reach pre-existing disputes. That, of course, is nothing more than an application of the rule that parties are bound to arbitrate only those kinds of disputes which they have agreed to arbitrate. And, consent must be manifest, not implied by silence.

The conclusion that Brown & Root's DRP does not apply retroactively to reach Hendrick's pre-existing claims does not conflict with the well-established presumption favoring arbitration. In that respect,

it must be remembered that "[t]he presumption in favor of arbitration in not a mindless mantra," *Rudolph v. Alamo Rent A Car, Inc.,* 952 F.Supp. 311, 317 (E.D.Va. 1997), which may be invoked to set at naught well-established rules of contract construction such as the fundamental precept that courts may not read into a contract that to which the parties clearly did not agree. Furthermore, "the presumption does not apply the issue of which claims are arbitrable." *Carson,* at 328. To apply the presumption as Brown & Root urges here would permit the presumption to displace the fundamental rule that parties can be required to arbitrate only that which they have agreed to arbitrate. And, that would convert a federal preference for arbitration into a presumption that the parties intended to arbitrate disputes which predated their agreement to arbitrate even when the agreement does not so provide. There is no warrant in the controlling Supreme Court authority for such a result.

## C. Even if the DRP Applies Retroactively, the Plaintiff's Claims are not Arbitrable

■ Even if the DRP is given retroactive effect to reach claims that accrued before the 1993 Employment Contract, Hendrick's claims against Brown & Root are not arbitrable because they are not within the scope of disputes defined in the DRP to be arbitrable.[12] The parties agree that, to be covered by the DRP, a dispute must "relate[ ] to, arise[ ] from, concern[ ] or involve[ ] in any way ... (2) the employment of [Hendrick] or ... (4) any other matter related to the relationship between [Hendrick] and [Brown & Root]." DRP at ¶ 3B.

The gravamen of each claim asserted by Hendrick is that Brown & Root unlawfully used his name to secure permits on a

---

12. Ordinarily, it is preferable to articulate a single basis for decision and, conversely, to refrain from making alternative holdings. *Karsten v. Kaiser Found. Health Plan of the Mid–Atlantic States, Inc.,* 36 F.3d 8, 11 (4th Cir.1994). However, considering that the de-

cision here on the first issue is amenable to immediate appeal and an attendant stay pending appeal, it is in the interest of judicial economy and fairness to the parties for the Court to resolve Hendrick's alternative argument.

project for which Hendrick was not hired and on which he performed none of his employment activities. Although the alleged misappropriation of Hendrick's name occurred at a time when he was in the employ of Brown & Root, the allegedly unlawful use did not arise out of, or relate to, or concern, or involve Hendrick's employment or any other matter related to his relationship with Brown & Root. It is undisputed that the permits related to a trade for which Hendrick was not licensed and to a project entirely unrelated to the one for which he was employed at the time. Indeed, Hendrick never worked on the project for which the permits were obtained. Nor is there inherent in the misconduct attributed to Brown & Root any employment nexus between Hendrick and Brown & Root.

Because the language of the DRP is plain and capable of legal construction, it alone determines the force and effect of the plan's application and the court cannot search beyond this clear contract language to extract a different meaning. *See, F.D.I.C. v. Prince George Corp.,* 58 F.3d 1041, 1046 (4th Cir.1995); *Riggs Nat'l Bank of Washington, D.C. v. Linch,* 36 F.3d 370, 374 (4th Cir.1994). On the facts of this record, it is clear that Hendrick's claims do not satisfy the criteria for arbitration as crafted by Brown & Root in the contract language which it authored.

## CONCLUSION

For the foregoing reasons, the defendant's Motion for Stay and to Compel Arbitration is denied.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record. The Clerk shall not distribute copies by "electronic or computer means" unless explicitly directed.

It is so ORDERED.