2022 IL App (1st) 211214-U

No. 1-21-1214

Second Division
September 30, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| MICHELLE SHERRIER and DAVID GAEGER, deceased, by his Special Representative, MICHELLE SHERRIER, as individuals and as Class Representative for those similarly situated, | ) ) ) ) ) ) | Appeal from the Circuit Court of Cook County, Chancery Division |
| | ) | No. 20 CH 4282 |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | Honorable Anna H. Demacopoulous, |
| ALLIANT CREDIT UNION, | ) ) | Judge, presiding. |
| Defendant-Appellant. | ) | |

_____

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The circuit court erred in denying defendant credit union's motion to compel arbitration as the arbitration clause was validly executed and the clause was not procedurally or substantively unconscionable.

¶ 2    Plaintiffs-appellees, Michelle Sherrier and David Gaeger (plaintiffs) filed an amended four-count complaint against defendant-appellant, Alliant Credit Union (Alliant), alleging

violations of the Illinois Consumer Fraud and Deceptive Business Practices Act (Illinois Consumer Fraud Act) (815 ILCS 505/1, *et seq.* (West 2020)). Alliant moved to compel arbitration, which the circuit court denied, and Alliant now appeals. For the reasons that follow, we reverse.

¶ 3                                    I. BACKGROUND

¶ 4                              A. Relationship with Alliant

¶ 5     Plaintiffs were married Illinois residents. Alliant is a member-owned, not-for-profit financial cooperative.[1] Sherrier became a member of Alliant beginning on or around December 1978, and in 2008, she added Gaeger as a joint account holder to several of her Alliant accounts.[2]

¶ 6     Membership at Alliant is governed by the "Account Agreement and Disclosures Booklet," also known as the "Membership Agreement." Relevant to this appeal are the 2008 and 2019 versions of the Membership Agreement. The 2008 version provided that each account holder jointly and severally "agree[s] to the terms and conditions" in the Membership Agreement and, importantly, "*any amendments to these documents from time to time which collectively govern your Membership and accounts*." (Emphasis added.) The 2008 Membership Agreement further stated that "[e]xcept as provided by applicable law, [Alliant] *may change the terms of this Agreement*" subject to written notice via mail. (Emphasis added.) Notably, the 2008 Membership Agreement did not contain any language regarding arbitration.

¶ 7                          B. The Loan and Debt Plan Agreements

---

[1] Alliant had been previously named "United Air Lines Employees' Credit Union," and changed its name in or around 2003. Sherrier became a member of Alliant's predecessor in 1978.

[2] When adding Gaeger to the accounts, Gaeger listed his birthdate as October 14, 1945. At some point in time, Sherrier and Gaeger also elected to receive electronic notices from Alliant and provided their email addresses to receive such notices.

¶ 8     On July 17, 2018, Sherrier and Gaeger jointly entered into a "Loan Security Agreement and Disclosure Statement" (the loan) for the purpose of financing an automobile. Sherrier and Gaeger both signed the loan as borrowers, and certified that they "agree[d] to the terms of the *** agreement."

¶ 9     Paragraph 13 of the loan agreement provided that:

> "This written loan agreement represents the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties."

¶ 10    In conjunction with the loan, plaintiffs also jointly entered into a "Debt Protection Plan" (debt plan) after paying a one-time premium of $549.52. The purpose of the debt plan was to "protect an [e]ligible [b]orrower" in the case of certain "protected events," including death. Specifically, in the event of an eligible borrower's death, Alliant agreed to "cancel the amount of [the] Outstanding Balance as of the date of death, up to $100,000."

¶ 11    To qualify for the debt plan, applicants had to meet certain criteria. Under the section of the application entitled "Application Eligibility," the application read, in relevant part: "To be eligible to apply, I must meet the following conditions. By signing this Application, I am stating that: (1) *I am under age 70.*" (Emphasis added.) Located under this paragraph was another section for the borrowers' signature. Above the signature line, the application further stated:

> *"I acknowledge and agree that (a) I meet the eligibility requirements listed above.* If it is discovered that I do not meet the eligibility requirements above, my participation in the Plan will be terminated, I will receive a refund of any fees paid, and an otherwise valid claim will be denied. (b) I have received the disclosures herein and have thoroughly read the Debt Protection Program Agreement ***, and agree to abide by the terms of the

Agreement; *** and (d) I understand that I may not be eligible for all benefits contained in the Plan. *This document is hereby incorporated into Borrower's loan documentation as if fully set forth therein.* **There are eligibility requirements, conditions, and exclusions that could prevent you from receiving benefits under the Program. See the Program Agreement for details."** (Italicized emphasis added, bolded emphasis in original.)

Both Sherrier and Gaeger signed the first page of the debt plan.

¶ 12 On the second page of the debt plan, it indicated that the debt plan "amend[ed] [the borrower's] loan or credit agreement," that the "terms of the [debt plan], including the rates," could be changed at any time, and that prior notice would be provided with an opportunity to cancel. With regard to the protected event provisions, the debt plan stated that if a qualifying event occurred within the first two years of the plan, and the borrowers "did not meet the eligibility requirements *at the time of* [*the*] *application*, *** protection under the Plan [would] be removed [and the borrower would] receive a refund of fees paid, and an otherwise valid claim [would] be denied." (Emphasis added.)

¶ 13 Last, the debt plan also provided for certain "Exclusions," which applied to "both the Outstanding Balance and any and all advances under a line of credit." Relevant here, the Agreement stated, in a bolded and partially underlined heading, that "[b]enefits will not be provided under any Protected Event if the Protected Event: *** (5) *occurs on or after your 70th birthday*." (Emphasis added.) Notably, neither the debt plan nor the loan agreement expressly referenced any version of the membership agreement.

¶ 14 C. The 2019 Amendment and Arbitration Provisions

¶ 15 In 2019, Alliant amended its Membership Agreement. Relevant here, one such change was the addition of an agreement to arbitrate. The 36-page Membership Agreement included a table of

contents, which listed "Arbitration Agreement" as item number 13, located on page 10 of the document. At the bottom of the table of contents, the 2019 version provided that "[t]his Account Agreement and Disclosures booklet supersedes all previous versions of Alliant['s] *** account agreement and disclosures booklet. This Disclosure may change from time to time."

¶ 16    On the second page of the document, the agreement stated that it "cover[ed] both your and our rights and responsibilities concerning accounts Alliant *** offers." The Agreement further provided that, "[b]y signing a Membership Enrollment Agreement, each of you, jointly and separately, agree to the terms and conditions in this Account Agreement and Disclosures Booklet, the Membership Enrollment Agreement, the Funds Availability Policy Disclosure, the Truth-in-Savings Disclosure, Fee Schedule, Privacy Notice, Remote and Electronic Deposit Services Agreement[,] and any amendments to these documents from time to time that collectively govern your Membership and accounts."

¶ 17    With regard to the arbitration clause, Section 13 of the document stated:

"**13. ARBITRATION AGREEMENT.**

\*\*\*    \*\*\*    \*\*\*

**ARBITRATION AGREEMENT.** If you have a dispute, we want to resolve it as quickly and easily as possible. *** If we are unable to informally resolve your dispute, you agree that it shall be resolved in arbitration. You or Alliant can initiate the arbitration as described in this section.

**WHAT IS ARBITRATION?**

**Arbitration means an impartial third party will hear the dispute between Alliant and you and provide a decision. \*\*\* A "dispute" is any unresolved disagreement between Alliant and you. A "dispute" shall also include a disagreement**

**about this Arbitration Agreement's meaning, application, or enforcement and whether arbitration applies to a dispute. However, a dispute does not include the interpretation, validity and enforceability of the class action waiver set forth below. Disputes regarding the interpretation, validity, and enforceability of the class action waiver shall be decided by a court. This Arbitration Agreement is entered into pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA").**

**Do I have to agree to this Arbitration Agreement?**

Yes. Unless you opt out of this arbitration agreement, then all disputes shall be decided by arbitration. You may opt-out of this Arbitration Agreement by calling us at 800-328-1935 or by sending a secure message through our online banking system within 60 days of this notice being sent or establishing your membership.

**What disputes are subject to arbitration?**

Disputes between you and Alliant about your membership, accounts, account transactions, loans, and any related service with Alliant are subject to arbitration. Any disputes arising from or relating to this Arbitration Agreement, any prior Membership and Account Agreement between you and Alliant, or the advertising, the application for, or the approval or establishment of your membership are also included. Disputes are subject to arbitration, regardless of what theory they are based on or whether they seek legal or equitable remedies. Arbitration applies to any and all such disputes, whether they arose in the past, may currently exist, or may arise in the future.

**Can I still have my dispute heard by a court or be part of a class action? Unless you opt-out of this Arbitration Agreement, you and Alliant are waiving the right to have a dispute heard before a judge or jury, or decided by a court or government**

**tribunal. You and Alliant also waive any right or ability to participate in a representative or class action basis in arbitration or court.**

\*\*\*  \*\*\*  \*\*\*

### How is a dispute submitted to arbitration and what rules apply to Arbitration?

Either Alliant or you may submit a dispute to arbitration at any time[.] \*\*\* The party electing arbitration must choose between one of two organizations: the American Arbitration Association \*\*\* or Judicial Arbitration and Mediation Services[.] \*\*\* A single arbitrator will conduct the arbitration using applicable substantive law and is bound by the terms of this Arbitration Agreement. \*\*\* The arbitrator's decision, rendered in a reasoned opinion, will be final and binding on the parties. A party can file a written appeal to the arbitration administration within 30 days of issuance of the award. \*\*\* The panel will reconsider all factual and legal issues, following the same rules of procedure as the initial arbitration, and based on a majority vote therefore determining whether any reversible error has occurred.

### Who pays Arbitration fees and expenses?

[Alliant] will reimburse the amount of filing, case management, administration, and arbitrator fees you're required to pay. Notwithstanding the foregoing, we will not reimburse you for any fees if the arbitrators determine that your claim or dispute was frivolous or baseless. Each party will be responsible for its own fees, including attorney[] fees in any arbitration, except that the arbitrator is permitted to award attorney[] fees to the prevailing party under applicable law or agreement." (Emphasis in original.)

¶ 18    Section 15 of the 2019 Membership Agreement also stated that Alliant "may change the terms of this Agreement" and that any changes regarding changes in terms, rates, or fees would be sent to the members via mailing address or by electronic notice.

¶ 19    On August 1, 2019, Alliant sent electronic notice of the 2019 Membership Agreement to the two email addresses provided by Sherrier and Gaeger. The notice included a cover letter that briefly described some of the changes to the Membership Agreement.[3] The cover letter did not reference the arbitration agreement.

¶ 20                              D. Gaeger's Death

¶ 21    On or about February 28, 2020, Gaeger passed away. At some point following Gaeger's death, Sherrier made a claim on the debt plan, which Alliant denied because Gaeger had passed away after his 70th birthday. Alliant also refused to return the initial premium paid at the time the debt plan was executed.

¶ 22                        E. Circuit Court Proceedings

¶ 23    On May 5, 2020, plaintiffs filed a six-count complaint against Alliant, as an individual, as special representative of Gaeger, and as class representative for all those similarly situated.[4] The complaint was amended on September 21, 2020, and the four-count amended complaint is the operative complaint.

¶ 24    Although the complaint has four "counts," the claim is essentially a single count for deceptive practices under the Illinois Consumer Fraud Act. The complaint alleged, generally, that under the terms of the debt plan, Alliant collected a fee from Sherrier and Gaeger that neither

---

[3] The cover letter included in the record appears to be a generic form template sent to all members of Alliant, as it is unaddressed to a specific recipient.

[4] On September 17, 2020, the circuit court granted Sherrier's request to be appointed as special representative for the estate of David Gaeger.

would be able to utilize towards the balance of their loan, and that they were "sold nothing of value in exchange for the premium/fees except an empty and fraudulent promise." The complaint also stated that Alliant had entered into a " 'cooperative' marketing or excess coverage plan with Minnesota Life Insurance (Securian)" to underwrite the debt plan, with the intent to "avoid state [i]nsurance regulations on credit life insurance." The complaint further noted that neither the debt plan nor the loan contained an arbitration clause or class action waiver.

¶ 25    Specifically, as to Count I, the plaintiffs alleged that Alliant's collection of their premium was a "deceptive practice" because Gaeger had been 70 years old at the time of payment, indicating that Alliant had no intention to ever cancel the loan. Plaintiffs alleged that the debt plan was an essential term of the relationship, and that "they would not have contracted the loan without" it.

¶ 26    Count II was brought on a class action basis pursuant to section 2-801 of the Code of Civil Procedure. 735 ILCS 5/2-801 (West 2020). Plaintiffs alleged that Alliant transacted hundreds of loans in Illinois, and "dealt with consumers such as [Sherrier and Gaeger] on a daily basis. As such, plaintiffs sought to represent "individual consumers who *** entered into loan agreements with [debt plans] where[] Alliant *** (a) sold *** [debt plans] to those over 70 [years old]" and (b) where Alliant "sold the [debt plan] and denied the claim over a 'protected event' and failed to return the fee/premium." Counts III ("Appointment of Special Representative") and IV ("Motion to Certify the Class") were both in the nature of motions.

¶ 27    Overall, the plaintiffs sought a declaration that Alliant's sale of the debt plan and loans were fraudulent, as well as its failure to return fees and premiums after an exclusion to the protected event was claimed. The amended complaint attached a copy of the loan and debt plan.

¶ 28    On October 30, 2020, Alliant filed a "Motion to Dismiss or Stay and Compel Arbitration" pursuant to section 2-619(a) of the Code of Civil Procedure (735 ILCS 5/2-619(a) (West 2020)),

section 2 of the Illinois Uniform Arbitration Act (720 ILCS 5/2(a) (West 2020)), and section 2 of the Federal Arbitration Act (FAA) (9 U.S.C § 2 (West 2020)). Alliant attached the affidavit of Chris Moore, its Director of Deposit Product and Payment Strategy, as an exhibit to the motion. The affidavit attested that Sherrier and Gaeger received notice of the 2019 Membership Agreement, which included the arbitration clause, and that both had failed to opt out.

¶ 29 Alliant argued that per the 2008 Membership Agreement, plaintiffs agreed to be bound by Alliant's periodic amendments to the agreement, effective upon transmission. That notwithstanding, Alliant pointed out that the newly added arbitration clause had not been mandatory, but by failing to opt out, plaintiffs had agreed to arbitrate any past, present, or future disputes. In support of the motion, Alliant cited to a federal district court order, *Page v. Alliant Credit Union*, No. 1:19-cv-5965, WL 2020 2526488 (N.D. Ill. May 18, 2020), which assessed the same issue of whether the arbitration agreement had been validly executed. Alliant further contended that the plaintiffs' claim for deceptive practices arose out of the debt plan purchased in connection with their loan, which fell squarely within the scope of the arbitration agreement, as either a past or current dispute. Finally, Alliant argued that any doubts regarding arbitrability was a matter to be resolved by the arbitrator pursuant to the arbitration clause.

¶ 30 Plaintiffs filed a response, disagreeing that an agreement to arbitrate existed because neither the loan agreement nor the debt plan included any arbitration clauses. Plaintiffs further argued that the 2008 Membership Agreement did not contain any language that indicated that the terms of a loan could be changed "retroactively" by Alliant and was not expressly incorporated within the debt plan or loan. Finally, plaintiffs argued that application of the "retroactive" arbitration clause to earlier unrelated agreements constituted a "deceptive and fraudulent practice," a claim not raised in the amended complaint. Plaintiffs also argued that their claims were sufficient

under the state consumer fraud act. As to the language of the arbitration clause, plaintiffs argued that the clause was "ambiguous" because it was not clear that it would affect loans, and that both the arbitration clause and class action waiver were procedurally unconscionable.

¶ 31 In its reply, Alliant rejected the characterization of its purported attempt to "retroactively" change the loan's terms but maintained that the arbitration clause governed all disputes between it and its members, including any disputes about loans and related services, regardless of when they arose. Alliant pointed out that plaintiffs did not dispute that the Membership Agreement governed the relationship between the parties, and that they had failed to opt out of the arbitration provision. Alliant maintained that loans and related services were covered within the broadly drafted arbitration clause, and that it did not matter that neither the loan nor the debt plan contained separate arbitration provisions. Alliant also rejected plaintiffs' contention that the arbitration clause was ambiguous or procedurally unconscionable, noting that plaintiffs' arguments as to these points were "undeveloped" and just a rehashing of their retroactivity argument. Finally, Alliant reiterated that, as there was a presumption in favor of arbitration, any doubts regarding arbitrability should be resolved by the arbitrator. Plaintiffs filed a brief sur-response to address the *Page* decision.

¶ 32 On April 20, 2021, the circuit court heard arguments on Alliant's motion and in a written ruling denied the same. In so ruling, the court observed that "[n]either the loan itself nor the [debt plan] contain[ed] any arbitration agreements or class action waivers" and that "neither document explicitly reference[d] or incorporate[d] the Alliant Membership Agreement." The circuit court stated "[c]onsidering the public policy at issue in this case—both in protecting elderly citizens in general and consumers specifically against fraud and deceptive business practices—and the fact that the arbitration provision Alliant wishes to enforce is under a document not referenced in the

complaint, and not at issue in this litigation, that was executed more than a year after the allegedly harmful business practices occurred, this [c]ourt holds that there is no agreement to arbitrate or waive class action rights as to the [l]oan or [debt plan]."

¶ 33    This appeal followed.

¶ 34                                    II. ANALYSIS

¶ 35    We begin with a brief discussion of the statute at issue. The Act codifies the legislature's endorsement of arbitration agreements as a cost-effective method of dispute resolution. 710 ILCS 5/1 (West 2020); *Liu v. Four Seasons Hotel, Ltd.*, 2019 IL App (1st) 182645, ¶ 24. Section 2 of the Act governs proceedings to compel or stay arbitration. 710 ILCS 5/2 (West 2020); *Liu*, 2019 IL App (1st) 182645, ¶ 24. Pursuant to section 2(a), "[o]n application of a party showing an agreement [to arbitrate], and the opposing party's refusal to arbitrate, the court shall order the parties to proceed with arbitration[.]" 710 ILCS 5/2(a) (West 2020). In the event that the opposing party "denies the existence of the agreement to arbitrate, the court shall proceed summarily to the determination of the issue so raised and shall order arbitration if found for the moving party, otherwise, the application shall be denied." *Id.*

¶ 36    On appeal, Alliant argues that the circuit court erred in denying its motion to compel arbitration for three main reasons: (1) plaintiffs failed to opt out pursuant to the terms of the 2019 Membership Agreement; (2) the arbitration clause governs plaintiffs' consumer fraud claim as it concerns a "loan" and "related service," and (3) the arbitration clause was not unconscionable. Alternatively, Alliant contends that the matter should at least be referred to arbitration in order to allow the arbitrator to resolve any disputed issues of arbitrability.

¶ 37                                 A. Standard of Review

¶ 38    Initially, the parties dispute the proper standard of review. Alliant contends that the standard is *de novo*, as the circuit court denied its motion to compel arbitration without an evidentiary hearing. On the other hand, plaintiffs argue that the proper standard is "whether there was a sufficient showing to sustain the circuit court's order," because, according to plaintiffs, the circuit court "made extensive factual findings" with regard to the "sequence of events" stemming from the 2008 Membership Agreement to the 2019 version. Plaintiffs assert that the circuit court found that the loan agreement and the debt plan were standalone contracts with their own consideration. Additionally, plaintiffs posit that the court "did a detailed factual analysis of the sequence of events over a ten-plus year period between the original Membership, the loan and the amended Membership." Without expressly characterizing the standard as "abuse of discretion," plaintiffs urge that "deference should be shown to the trial [c]ourt," citing *Midland Funding, LLC v. Raney*, 2018 IL App (5th) 160479 in support.

¶ 39    We disagree with plaintiffs' characterization of the proceedings below. The record reflects that the circuit court heard oral argument on Alliant's motion to compel. However, there was no evidentiary hearing. Instead, the circuit court reviewed and construed the several contractual agreements between the parties and subsequently concluded that no arbitration agreement existed. In fact, the circuit court's written ruling indicated that there were "no disputed facts at this time," and that the issue before the court concerned "whether the class action waiver and mandatory arbitration agreement in the 2019 Membership [Agreement] control[ed] and [was] incorporated into the earlier signed and executed [l]oan and [debt plan]."

¶ 40    In an appeal from the denial of a motion to compel arbitration, where no evidentiary hearing has taken place, our review is *de novo*. *Clanton v. Oakbrook Healthcare Centre, Ltd.*, 2022 IL App (1st) 210984, ¶ 42; see also *Hayes v. Victory Centre of Melrose Park SLF, Inc.*, 2017 IL App (1st)

162207, ¶ 11. Likewise, issues of contractual interpretation, including with respect to arbitration provisions, are reviewed *de novo*. *Clanton*, 2022 IL App (1st) 210984, ¶ 42. " '*De novo* review is completely independent of the trial court's decision,' meaning 'the reviewing court performs the same analysis a trial judge would perform.' " *Davis v. Pace Suburban Bus Division of the Regional Transportation Authority*, 2021 IL App (1st) 200519, ¶ 33 (quoting *People v. Randall*, 2016 IL App (1st) 143371, ¶ 44). Simply put, we accord no deference to the trial court's judgment or its reasoning. *Platinum Partners Value Arbitrage Fund, Ltd. Partnership v. Chicago Board Options Exchange,* 2012 IL App (1st) 112903, ¶ 12 (citing *People v. Vincent*, 226 Ill. 2d 1, 14 (2007)).

¶ 41    Having settled the matter regarding our standard of review, we turn to the crux of Alliant's appeal: whether the circuit court erred in denying Alliant's motion to compel arbitration. The parties agree that review of a motion to compel "raises a sole and narrow issue," namely, "whether the parties agreed to arbitrate the dispute." *Liu*, 2019 IL App (1st) 182645, ¶ 24. Thus, as plaintiffs correctly note, whether the sale of the debt plan implicates a consumer fraud or deceptive practice is not before us and we express no opinion in that regard.

¶ 42                      B. Whether an Agreement to Arbitrate Exists[5]

¶ 43    Alliant contends that the circuit court erred in finding that no agreement to arbitrate exists. Alliant asserts that the court confused the concept of arbitrability with the threshold question of whether an agreement exists. Alliant notes that it made an offer to plaintiffs to arbitrate at the point

---

[5] We observe that Alliant's arbitration clause states that it is "pursuant to the Federal Arbitration Act." Alliant's motion to compel was brought pursuant to section 2-619 of the Illinois Code of Civil Procedure, the Act, and the FAA. The issue of arbitrability is dealt with differently depending on which statute applies and what tie a particular contract may have to interstate commerce. See *Carey v. Richards Building Supply Co.*, 367 Ill. App. 3d 724, 726 (2006) (under federal law, the trial court decides the issue of arbitrability; under Illinois law, the issue may be resolved by either the trial court or the arbitrator, depending on the circumstances). However, both parties proceeded under Illinois law before this court and below. Thus, we deem the parties' intent on the issue of arbitrability to be that Illinois law applies.

in time that it e-mailed its updated Membership Agreement to plaintiffs and that, by failing to opt out, plaintiffs accepted the offer.

¶ 44    Although plaintiffs raise questions concerning the manner in which the arbitration clause was presented, they do not actually dispute the existence of the clause as it appears in the 2019 Membership Agreement.[6] Their bone of contention is whether that clause applies to the loan agreement and the debt plan, which we discuss later.  Even so, the circuit court determined, based on public policy considerations, that no arbitration agreement existed.  Thus, we consider, in the first instance, whether a contract to arbitrate actually exists. See *Aste v. Metropolitan Life Insurance Co.*, 312 Ill. App. 3d 972, 975 (2000) ("Whether under federal rules or state law, there is no arbitration without a valid contract to arbitrate").

¶ 45    "An agreement to arbitrate presents a matter of contract." *Liu*, 2019 IL App (1st) 182645, ¶ 25.  "Whether the parties actually agreed to arbitrate is determined pursuant to state-law contract principles." *Zobrist v. Verizon Wireless*, 354 Ill. App. 3d 1139, 1143 (2004) (abrogated on other grounds); see also *Tortoriello v. Gerald Nissan of North Aurora, Inc.*, 379 Ill. App. 3d 214, 226 (2008). "In Illinois, an offer, an acceptance and consideration are the basic ingredients of a

---

[6] Throughout their brief, plaintiffs argue that the class action waiver, a provision included within the arbitration clause, also does not appear in either the loan agreement or the debt plan, and thus, similarly to the arbitration clause, does not apply to the loan agreement and debt plan. Under the terms of the arbitration clause, "[d]isputes regarding the interpretation, validity and enforceability of the class action waiver are to be decided by a court." A determination that the arbitration clause does not exist would automatically doom the class action waiver imbedded therein. However, an opposite conclusion would have rendered the separate issue ripe for the circuit court's determination. We observe that the class action waiver issue was discussed in plaintiffs' response to the motion to compel, and that as a part of its ruling, the circuit court held that there was "no agreement to arbitrate or to waive class action" on the basis that the 2019 Membership Agreement did not encompass the loan agreement or debt plan. Therefore, because the circuit court denied the existence of the arbitration clause, it did not need to reach the issue of the validity of the class action waiver clause. In any case, we deem the issue of the validity of the class action waiver as not properly before us and therefore express no opinion regarding either its interpretation, validity or enforceability.

contract." *Melenia v. Anheuser-Bush, Inc.*, 219 Ill. 2d 135, 151 (2006). As is apparent below, we find all three elements present here.

¶ 46    Alliant contends that a valid agreement to arbitrate was formed when plaintiffs failed to opt out of the clause as contained within the 2019 Membership Agreement within the 60 days provided for by the credit union. We agree with Alliant that the arbitration clause would have been effective the moment it was transmitted to the plaintiffs based on the terms of the 2008 Membership Agreement and prior course of dealings between the parties. See *Ragan v. AT&T Corp.*, 355 Ill. App. 3d 1143, 1149 (2005) ("Illinois courts have recognized that silence can constitute an acceptance of an offer when it is reasonable, because of prior dealings or otherwise, that the offeree should notify the offeror if he does not intend to accept the offer."); see also *Fineman v. CitiCorp USA, Inc.*, 137 Ill. App. 3d 1035, 1042-43 (1985) (silence in response to a mailed notification of amended credit card agreement constituted acceptance of amended terms); *Hutcherson v. Sears Roebuck & Co.,* 342 Ill. App. 3d 109, 119 (2003) (where members were placed on notice in their original agreement that the agreement could be amended, any amendment adding an arbitration provision "should not have been a surprise.").

¶ 47    Here, however, Alliant allowed plaintiffs 60 days to consider the clause and provided them with at least two ways to opt out. See *Hutcherson*, 342 Ill. App. 3d at 119 (amendment adding arbitration clause not unconscionable where plaintiffs were given notice of amendment and an opportunity to reject it). Alliant also proffered an affidavit indicating that electronic notice of the amendments to the Membership Agreement had been successfully sent to Sherrier and Gaeger, who did not present a counter-affidavit on that point. Contra *Midland Funding, LLC,* 2018 IL App (5th) 160479, ¶ 24 (employee of party seeking arbitration failed to attest or testify that arbitration provisions had been communicated to customer, and customers executed sworn statements that

they had never been arbitration provision at issue). Accordingly, we find that there had been an offer and acceptance. Additionally, as there were mutual promises in the offered clause to arbitrate, we find that there was sufficient consideration to support an agreement to arbitrate. See *Bishop v. We Care Hair Development Corp.*, 316 Ill. App. 3d 1182, 1199 (2000) (mutual promise to arbitrate is sufficient consideration to support an agreement to arbitrate).

¶ 48    As further support, Alliant urges us to consider a federal slip opinion from the Northern District of Illinois, *Page v. Alliant Credit Union*, as directly on point. Although we are not bound by the outcome or reasoning of a federal trial court analyzing Illinois arbitration law, let alone an unpublished slip opinion (see *Corbett v. Devon Bank*, 12 Ill. App. 3d 559, 567 (1973)), we find *Page* persuasive, especially as it dealt with the same 2019 Membership Agreement and arbitration clause before us today. No. 1:19-cv-5965, 2020 WL 2526488 (N.D. Ill. May 18, 2020), at *1.

¶ 49    In *Page*, the federal district court granted Alliant's motion to compel despite the plaintiffs' contention that they were not made aware of the 2019 amendments to the membership agreement. *Id.* Applying Illinois law, the district court found that the amendment was permissible based on the parties' prior dealings and ongoing contractual relationship. *Id.*, at *2. (Citations omitted.) The district court further found that the "conspicuous and unambiguous opt-out provision of the agreement," in conjunction with plaintiff's failure to opt out, "constitute[d] assent to the arbitration provision." *Id.* Finally, the court rejected any contention that the accompanying cover letter to the amended 2019 Membership Agreement did not mention any new arbitration provisions. *Id.*

¶ 50    Plaintiffs' reliance on the cover letter as failing to inform users of the arbitration clause is also of no import, as the cover letter was not a part of the Membership Agreement. *See Hutcherson*, 342 Ill. App. 3d at 119. However, any analysis as to whether a consumer would be adequately informed by the cover letter is more appropriately suited to a procedural unconscionability

analysis, which we will discuss later in this disposition. See *Id.*, 342 Ill. App. 3d at 114, 119 (although cover letter did not mention arbitration agreement, court upheld arbitration agreement under both procedural and substantive unconscionability analysis).

¶ 51 The 2008 Membership Agreement expressly provided that the plaintiffs were bound by any changes to the agreement, and here, such changes were the 2019 Membership Agreement, which contained an arbitration clause. Plaintiffs do not dispute that they were on notice of the changes as reflected in the Membership Agreement, and given the language of the 2008 Agreement, which allowed for Alliant to make amendments to the governing agreement as needed, we agree that the relationship between the parties supports a finding of a validly executed agreement to arbitrate. Further, the parties do not dispute that they failed to opt out of the arbitration agreement. Accordingly, we find that the circuit court erred in concluding that no agreement to arbitrate existed. We now determine whether the scope of the agreement encompassed the loan agreement and debt plan at issue.

C. Whether the Arbitration Clause Governs the Loan and Debt Plan

¶ 52 Alliant contends that the circuit court erred in finding that the arbitration clause in the 2019 Membership Agreement does not encompass plaintiffs' loan and debt plan agreements. Pointing to language in the arbitration clause, Alliant maintains that the agreement covers "any unresolved disagreement between Alliant and plaintiffs, including disputes concerning loans provided by Alliant or any "related service with Alliant."

¶ 53 Plaintiffs disagree, contending that the 2019 Membership Agreement is an entirely separate contract between the parties. Plaintiffs' contention, with which the circuit court agreed, is that as neither the loan agreement nor the debt plan contained "an anti-class action or forced arbitration

clause," their dispute is not subject to arbitration. They urge this court to treat the loan agreement and the debt plan as "free standing final agreements." We decline.

¶ 54    "Whether to compel arbitration is not discretionary." *Travis v. American Manufacturers Mutual Insurance Co.,* 335 Ill. App. 3d 1171, 1175 (2002). Indeed, arbitration is mandatory when there is a valid agreement in place and the parties' dispute falls within the scope of that agreement. *Id.* "On the other hand, where there is no valid arbitration agreement or where the parties' dispute does not fall within the scope of that agreement, the trial court may not compel it." *Id.* We are mindful that the State favors arbitration and, "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute[,] [d]oubts should be resolved in favor of coverage." *AT&T Technologies, Inc. v. Communication Workers of America*, 475 U.S. 643, 650 (1986) (quoting *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582-583 (1960)).

¶ 55    Parties to an agreement are "bound to arbitrate only those issues they have agreed to arbitrate, as shown by the clear language of the agreement and their intentions expressed in that language." *Liu*, 2019 IL App (1st) 182645, ¶ 25 (quoting *Royal Indemnity Co. v. Chicago Hospital Risk Pooling Program*, 372 Ill. App. 3d 104, 110 (2007)). Thus, when construing a contract, we seek to effectuate the intent of the parties by examining the contract as a whole, with attention to the express language of the contract through its plain and ordinary meaning. *Id.* "The paramount factor in determining the parties' intention [with regard to an arbitration agreement] is the scope of the arbitration clause[.]" *Donaldson*, *Lufkin & Jenrette Futures, Inc. v. Barr*, 124 Ill. 2d 435, 443 (1988).

¶ 56    Alliant characterizes the arbitration clause as a "generic" provision, which are generally construed broadly by the courts. Under the terms of the provision, Alliant further asserts that

plaintiffs' claim is "an unresolved disagreement" premised on Alliant's alleged denial of benefits under the debt plan, which was issued in relation to the parties' loan and therefore concerns a "loan" and/or "related service with Alliant." Plaintiffs make no counter-argument regarding the characterization of the clause as generic. They instead persist in their argument that because neither the loan agreement nor the debt plan included an arbitration clause, the dispute which arose from operation of the plan must be settled in court as opposed to by arbitration.

¶ 57     "In keeping with [the] policy [of] favoring arbitration, courts have generally construed 'generic' arbitration clauses broadly," and have concluded that "parties are obligated to arbitrate *any* dispute that arguably arises under an agreement containing a 'generic' provision." (Emphasis in original.) *Fahlstrom v. Jones*, 2011 IL App (1st) 103318, ¶ 17. "Generic" arbitration clauses may "include those demanding the arbitration of all claims or disputes 'arising out of' or 'arising out of or related to' or 'regarding' the agreement at issue." *Id.*; see also *Donaldson*, 124 Ill. 2d at 443-444 ("The broadest arbitration clauses typically provide that 'any claim or controversy arising out of this agreement' is to be submitted to arbitration."). In contrast, "where an arbitration clause contains the phrase, 'arising out of the agreement' (or a variation thereof), but fails to also include the phrase, 'or relating to [the agreement]' (or a variation thereof), it is narrower than a generic clause, and arbitration should be limited to the specific terms of the contract or agreement containing the arbitration clause." *Guarantee Trust Life Insurance Co. v. Platinum Supplemental Insurance*, 2016 IL App (1st) 161612, ¶ 27 (quoting *Fiala v. Bickford Senior Living Group, LLC*, 2015 IL App (2d) 141160, ¶ 19)).

¶ 58     We turn to the contracts at issue. The parties agree that the 2008 Membership Agreement was the effective agreement prior to the 2019 amendments, which by its own terms allowed for Alliant to amend the agreement from time to time. In 2019, the Membership Agreement was

amended to include the new arbitration provision. There, Alliant defined an arbitrable dispute as "any unresolved disagreement between Alliant and you," which also "include[d] a disagreement about th[e] *** Agreement's meaning, application, or enforcement or whether arbitration applies to a dispute." The clause expressly exempted the "interpretation, validity, and enforceability of the class action waiver" from the term "dispute."

¶ 59    Disputes also subject to arbitration were further defined as "disputes between you and Alliant about your membership, accounts, account transactions, *loans*, *and any related services with Alliant*[.]" (Emphasis added.) The agreement also covers disputes "arising from or relating to this Arbitration Agreement, any prior Membership and Account Agreement between you and Alliant, or the advertising, the application for, or the approval and establishment of your membership[.]"

¶ 60    Notably, one portion of the arbitration provision contains language typically found in a generic clause, as it provides that disputes are those "arising from or relating to" the arbitration agreement, prior membership agreements, and any further actions relating to membership. Interestingly, it does not contain language regarding "this agreement," meaning the 2019 Membership Agreement. However, the scope of the clause is broad and includes "loans" and "any related service" with Alliant, which may include those that "arose in the past" or may "currently exist." We read this language to extend the reach of the clause to any other relationships between Alliant and its members as contemplated by the Membership Agreement.

¶ 61    The canons of contract interpretation require us to read its language harmoniously. See *In re Halas*, 104 Ill. 2d 83, 92 (1984) (In contract construction, effect must be given to all language "so that provisions which appear to be conflicting or inconsistent may be reconciled and harmonized."). Thus, we find that the arbitration clause may be read to reach the loan agreement

between Alliant and plaintiffs, as it specifically lists "loans" within the definition of "dispute." We also agree with Alliant that the debt plan is a "related service" to the loan. The debt plan expressly indicated that it would be incorporated into the loan documentation, that it amended the loan terms, and that its terms could be changed at any time, provided that prior notice be given to the borrowers. Of note, plaintiffs alleged that they would not have entered into the loan without the debt plan.

¶ 62 Moreover, as plaintiffs' counsel admitted during argument on the motion, the Membership Agreement ultimately governs the overall relationship between the parties. See *Flood v. Country Mutual Insurance Co.*, 41 Ill. 2d 91, 93 (1968) (arbitration agreements govern which issues are subject to arbitration). Given the structure of the relationship, logically speaking, each time plaintiffs utilized a service offered by Alliant, they would likely receive a separate agreement to that effect, as was done here with regard to the loan. Nevertheless, plaintiffs would still be bound by the terms of the effective version of the Membership Agreement, which provided access to the loan in the first place. Further, "[m]erely because the parties have created a chain of complicated and intertwined legal relationships on paper does not alter the basic fact" that the parties' relationship is governed by the overarching Membership Agreement, which was amended to include an arbitration clause that, in more ways than one, encompasses the loan and debt plan in dispute. *Kostakos v. KSN Joint Venture No. 1*, 142 Ill. App. 3d 533, 539 (1986); see also *A.E. Staley Manufacturing Company v. Robertson*, 200 Ill. App. 3d 725, 731 (1990) (noting that in order to determine full scope of parties' rights, all related contracts must be read together).

¶ 63 Plaintiffs additionally argue that the effect of allowing the 2019 arbitration clause to govern those agreements is to "retroactively" change the terms of the loan and debt plan. We perceive plaintiffs' retroactivity argument to present an issue of substantive conscionability, which we

discuss later is this disposition. We note before passing that application of the arbitration clause to the loan and debt plan was not a unilateral act on the part of Alliant. Again, plaintiffs were afforded a 60-day opportunity to opt-out of the agreement to arbitrate; however, they did not do so. The practical effect of plaintiffs' failure to opt-out was an agreement to arbitrate disputes relating to the loan agreement and the debt plan.

¶ 64    Moreover, as Alliant points out, the dispute which gave rise to this lawsuit arose subsequent to the parties' agreement to the arbitration provision. But even if we were to agree with plaintiffs that the dispute arose prior to the execution of the arbitration agreement, the reach of the arbitration clause is broad enough to contemplate coverage as it applies to "any and all such disputes, whether they *arose in the past, may currently exist*, or may arise in the future." (Emphasis added.) Thus, the clause sufficiently covers when Alliant accepted the debt plan premium from plaintiffs (a dispute that arguably arose in the past) or when Alliant denied Sherrier's claim following Gaeger's death (a dispute that may currently exist or may have arisen in the future). Further, courts have upheld the requirement to arbitrate even after contracts have expired, suggesting that timing does not necessarily invalidate the imposition of a valid arbitration clause. See *All-American Roofing, Inc. v. Zurich American Insurance Co.*, 404 Ill. App. 3d 438, 450 (2010); *Rand-Bond of North America, Inc. v. Saul Stone & Co.*, 726 F. Supp. 684, 687-688 (N.D. Ill. 1989) (rejecting retroactivity argument in favor of the plain language of arbitration agreement). In any case, the decision to permit settlement of disputes, past, present or future, via arbitration was by agreement of the parties.

¶ 65    Plaintiffs additionally argue that Alliant failed to inform them in the cover letter that they had a right to opt-out of the "forced arbitration" clause. They note that the cover page of the Membership Agreement states that "Alliant is making changes," language which is in the future

tense and gives to a consumer "no inkling of a retroactive change." Plaintiffs make no suggestion that the referenced Membership Agreement was not made available to them for their review. Even accepting that the cover letter was in some way deficient or misleading, nothing precluded plaintiffs from reviewing the amended Membership Agreement. In fact, it was their responsibility to do so.

¶ 66    Plaintiffs further cite to *Vitacost v. McCants*, 210 So. 3d 761, 765 (Fla. Dist. Ct. App. 2017), in support of its contention that the loan agreement and debt plan were standalone final agreements that did not incorporate the Membership Agreement, and thus, as in *Vitacost*, arbitration should not be compelled. Initially, we again note that we are not bound by cases from the federal district courts, or cases from other jurisdictions. See *Corbett*, 12 Ill. App. 3d at 567. Second, even were we so bound, *Vitacost* is unavailing.

¶ 67    In sum, *Vitacost* involved the internet sale of a dietary supplement. *Id.* at 762. After purchase of the product online, the terms and conditions of the sale became accessible via hyperlink and, according to defendant, became incorporated into the entire sales agreement through what is known as a "browsewrap agreement." *Id.* In a browsewrap agreement, a purchaser may complete an online transaction without ever visiting the webpage containing the full terms and conditions of a sale. *Id.* Relevant here, the terms and conditions in *Vitacost* included an arbitration provision, which defendant attempted to enforce. *Id.* The Florida trial court denied the defendant's motion to compel arbitration, concluding that the arbitration clause, through the terms and conditions, had not been sufficiently incorporated into the sales agreement. *Id.*

¶ 68    On appeal, the court upheld the trial court's ruling. *Id.* The appellate court first observed that, "[i]n Florida, to incorporate a collateral document into an agreement, the agreement must: (i) specifically provide that the collateral document is being incorporated; and (ii) sufficiently

describe the collateral document being incorporated. *Id.* at 764-765. The appellate court agreed with the trial court that the terms and conditions of the sale were not sufficiently incorporated into the internet sale agreement. *Id.* at 766. The court noted that the hyperlink to the terms and conditions of the sale was located on the bottom of the page, which the user would need to scroll through in order to view. *Id.* at 765. Further, when closing out the transaction, the hyperlink was only labeled "terms and conditions" and did not contain any statement that the instant sale was subject to those terms. *Id.* As such, the court affirmed the denial of the motion to compel. *Id.* at 766.

¶ 69    To state the obvious, our case does not involve an internet sale with browsewrap agreements, but rather, written agreements with clearly legible and well-placed text. The *Vitacost* court expressed concern with the browsewrap's placement at the bottom of the webpage and relatively inconspicuous nature, which made the terms and conditions, and subsequently the arbitration agreement, not clearly apparent. In contrast here, the 2019 Membership Agreement was an accessible, written and overarching contract, covering all agreements entered between Alliant and plaintiffs, including the loan agreement and the debt plan. We further note that neither the loan agreement nor the debt plan included any provision for the disposition of disputes between it and its customers regarding those specific documents, further lending support to Alliant's position that the Membership Agreement encompassed those agreements as well. Finally, plaintiffs point to no Illinois law that requires the express incorporation of collateral documents, as espoused by the Florida court in *Vitacost*.

¶ 70    Even if we were doubtful that language of the arbitration clause was broad *enough* to encompass the loan and debt plan, such doubt would not foil operation of the clause. "When the language of an arbitration clause is broad and it is unclear whether the subject matter falls within

the scope of the arbitration agreement, the question of substantive arbitrability should [still] be initially decided by the arbitrator." *Donaldson*, 124 Ill. 2d at 446; *Carey*, 367 Ill. App. 3d at 728 (under Illinois law, "when the clause is broad and its scope is unclear, the determination of whether the dispute is arbitrable should be submitted to an arbitrator); compare *Flood*, 41 Ill. 2d at 94 (narrow arbitration clauses will not be extended by construction or implication). Accordingly, barring other defenses, plaintiffs' dispute was proper to be submitted to arbitration. However, our analysis does not end here. Plaintiffs contend that the arbitration clause is both procedurally and substantively unconscionable.

¶ 71                    D. Whether the Arbitration Agreement is Unconscionable

¶ 72    Plaintiffs argue that the arbitration clause should be defeated because it is unconscionable. Alliant responds that as plaintiffs failed to raise the issue of unconscionability in the circuit court, specifically that of substantive unconscionability, the issue is "waived." We believe the issue is properly before us. However, prior to proceeding further, we deem it appropriate to clarify the difference between "waiver" and "forfeiture."

¶ 73    Although the concepts of waiver and forfeiture are commonly used interchangeably by the parties, the two are distinct. *Pinske v. Allstate Property and Casualty Insurance Co.*, 2015 IL App (1st) 150537, ¶ 18. "Waiver" is the "voluntary relinquishment of a known right," whereas "forfeiture" refers to "the failure to make the timely assertion of the right." *Id.* (quoting *People v. Blair*, 215 Ill. 2d at 444 n.2 (2005)). Regardless of the characterization, "[i]t is axiomatic that questions not raised in the trial court *** may not be raised for the first time on appeal." *Shell Oil Co. v. Department of Revenue*, 95 Ill. 2d 541, 550 (1983).[7]

---

[7] Here on appeal, plaintiffs also allude to the arbitration agreement as having been fraudulently induced. We deem the argument to be forfeited, not only because it was not raised below, but also because

¶ 74 "State contract defenses may be applied to invalidate arbitration clauses if those defenses apply to contracts generally." *Bishop*, 316 Ill. App. 3d at 1196. "The doctrine of unconscionability is designed to prevent overreaching at the contract-formation stage." *Id.* Although it is true that "Illinois courts favor arbitration as a means of settling disputes," an arbitration clause will not be enforced if it is unconscionable, either procedurally or substantively. *Williams v. Jo-Carroll Energy*, 382 Ill. App. 3d 781, 784 (2008).

¶ 75                                 1. Procedural Unconscionability

¶ 76 Plaintiffs contend that the arbitration clause is procedurally unconscionable because it was "hidden on page 10" of a 35-page agreement, was "in a maze of fine print," and the cover letter discussing the changes to the Membership Agreement provided no indication that the amendments included an arbitration clause that applied to loans. Alliant contends that the circuit court erred in determining that the arbitration clause violated public policy and that the court failed to conduct an unconscionability analysis. Regardless, we do not find the clause to be procedurally unconscionable.

¶ 77 " 'Procedural unconscionability refers to a situation where a term is so difficult to find, read, or understand that [a party] cannot fairly be said to have been aware he was agreeing to it[.]' " *Kinkel v. Cingular Wireless, LLC*, 223 Ill. 2d 1, 22 (2006) (quoting *Razor v. Hyundai Motor America*, 222 Ill. 2d 75, 100 (2006)). Thus, courts will examine whether there was "some impropriety during the process of forming the contract[,] depriving a party of a meaningful

it is insufficiently developed for purposes of appellate review pursuant to Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) (appellant's brief must contain contentions along with citations to the authorities and pages in the record upon which it relies, and "[p]oints not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on a petition for rehearing."); see also *Block 418, LLC v. Uni-Tel Communications Group, Inc.*, 398 Ill. App. 3d 586, 590 (2010) (party forfeited issue due to undeveloped contentions; a party's failure to comply with our supreme court rules is grounds for forfeiture on appeal).

choice." *Id.* at 23 (quoting *Frank's Maintenance & Engineering, Inc. v. C.A. Roberts, Co.*, 86 Ill. App. 3d 980, 989-90 (1980)). Courts consider all of the circumstances surrounding the transaction, such as "whether each party had a reasonable opportunity to understand the terms of the contract, and whether important terms were hidden in a maze of fine print." *Id.* Courts also examine the "conspicuousness of the clause" and the negotiations relating to it, although both are not conclusive. *Id.* Courts may also consider the parties' experience and education, whether the contract contained fine print, and if high-pressure tactics were used. *Coe v. BDO Seidman, LLP*, 2015 IL App (1st) 142215, ¶ 31. Further, courts have noted that, "even if the arbitration clause is procedurally unconscionable '*to a degree*', *** that flaw is insufficient by itself to invalidate the clause." (Emphasis added.) *Tortoriello*, 379 Ill. App. 3d at 236.

¶ 78    Having considered the relevant documents, we cannot say that the arbitration clause was procedurally unconscionable. There is no evidence that the arbitration provisions were not "plainly visible in the agreement" or that "the meaning of [their] terms were [not] clear." *Coe*, 2015 IL App (1st) 142215, *¶* 31. The table of contents within the agreement lists "arbitration" as a topic of discussion. Arbitration is then discussed on pages 10, 11, and 12 of the agreement, with bolded and easy-to-read headings such as "What is arbitration," "Do I have to agree to this Arbitration Agreement," and "What disputes are subject to arbitration." The definition of "dispute" is bolded, as well as the section indicating what is excluded from the arbitration provision. The provision also clearly explains the arbitration process and how fees and expenses are handled. Thus, the discussion of arbitration is clearly conspicuous, there was no maze of fine print, and the clause was drafted in such a way that accommodated many levels of education and experience. See *Hutcherson*, 342 Ill. App. 3d at 119 ("Even a person conducting a cursory review of the pamphlet would have noticed this paragraph.").

¶ 79 Further, nothing within the language of the arbitration agreement appears out of the ordinary. See *Kinkel,* 223 Ill. 2d at 26 (noting that non-negotiable arbitration clauses presented in fine print are a "fact of modern life," even if the average consumer might not fully understand them); see also *Tortoriello,* 379 Ill. App. 3d at 234 ("Relatedly, we note that the 'disparity of bargaining power' *** is not fatal to the arbitration clause" because, as noted by our supreme court, such contracts "are typical of contracts of adhesion, which are not *per se* unconscionable."). Moreover, as noted by Alliant, this was not a typical "take-it-or-leave it" approach, which even on its own would not generally indicate unconscionability. See *Zuniga v. Major League Baseball*, 2021 IL App (1st) 201264, ¶ 15 (arbitration provisions contained within a preprinted, consumer contract form will not be found to be procedurally unconscionable "merely because a business sought to impose it through a standardized, take-it-or-leave-it contract over which the consumer had no ability to negotiate."); see also *Wigginton v. Dell, Inc.*, 382 Ill. App. 3d 1189, 1194 (2008) ("[U]nder Illinois law, a contract or provision may involve some degree of procedural unconscionability, but that may not be sufficient to render it unenforceable."). Alliant gave all of its members 60 days to decide to opt out of the arbitration agreement with at least two ways to do so, and it is undisputed that the plaintiffs did not. These were not "high-pressure tactics", and plaintiffs were not placed in a situation where they did not have a choice.

¶ 80 Finally, plaintiffs attempt to contrast this case with *O'Quinn v. Comcast Corp.,* No. 10 C 2491, 2010 WL 4932665 (N.D. Ill. Nov. 29, 2010), asserting that unlike here, Comcast sent its customers an agreement, which indicated in bold text on the first page that there was a forced arbitration clause on a particular page of the booklet, and that an opt-out option was available and would not affect the continuing relationship. Initially we note, again, that we are not bound by cases decided in the federal courts. See *Corbett*, 12 Ill. App. 3d at 567. Interestingly, the plaintiff

in *O'Quinn*, like plaintiffs here*,* also contended that the arbitration clause was procedurally unconscionable because it was "hidden in a maze of fine print." *Id.*, at \*4. The court rejected the plaintiff's argument, noting that the actual arbitration provision, located on page 21 of the 39-page document, and which included the subprovisions for opting out, appeared conspicuously in bold print and capitalized letters. *Id.* Further, *O'Quinn* does not stand for the proposition that an arbitration clause must be in bold type face or capital letters, or be located on the first page of the notification document, in order to survive an unconscionability analysis. Finally, even were we to consider *O'Quinn* for more than its persuasive value, it would actually appear to defeat, rather than support, plaintiffs' contention that the Alliant arbitration clause was procedurally unconscionable, given that it was also printed in bold text and utilized capitalized letters.

¶ 81    In any case, a "contracting party is not obligated to advise the other party of the contents of the agreement that they are signing." *All-American Roofing*, *Inc.*, 404 Ill. App. 3d at 447. It is also well-settled that consumers have a duty to read contracts to which they are a party. *Leon v. Max E. Miller & Sons*, *Inc.*, 23 Ill. App. 3d 694, 699 (1974) ("One is under a duty to learn, or know, the contents of a written contract before he [or she] signs it, and is under a duty to determine the obligations which he [or she] undertakes by the execution of a written agreement."); *Northern Trust Co. v. VIII South Michigan Associates*, 276 Ill. App. 3d 355, 365-66 (1995) ("A party cannot close his eyes to the contents of a document and then claim that the other party committed fraud merely because it followed [a] contract."). Accordingly, we find that the arbitration clause is not procedurally unconscionable.

¶ 82                    2. Substantive Unconscionability

¶ 83    Plaintiffs argued before the circuit court and now here that the arbitration agreement is unfair due to its "retroactive" nature as the clause essentially changes the terms of the parties'

previously executed loan and debt plan agreements. Although not artfully framed as substantive unconscionability, we find that the gist of the argument relates to the terms of the arbitration clause having an unfair effect on plaintiffs' rights, thus resulting in an unbalanced and one-sided relationship between the parties. We agree with Alliant that plaintiffs never raised any arguments regarding the actual *terms* of the arbitration clause, such as how the arbitration was to be conducted. Even so, because our review on this motion to compel arbitration is *de novo*, we must examine the arbitration clause in its entirety, which necessarily requires us to examine the actual text of the clause. Thus, we will not deem any argument related to substantive unconscionability to be forfeited.

¶ 84    Substantive unconscionability " 'concerns the actual terms of the contract and examines the relative fairness of the obligations assumed.' " *Williams*, 382 Ill. App. 3d at 784 (quoting *Hutcherson*, 342 Ill. App. 3d at 121). A clause may be found to be substantively unconscionable if the "contract terms [are] so one-sided as to oppress or unfairly surprise an innocent party, [if there is] an overall imbalance in the obligations and rights imposed by the bargain, and significant cost-price disparity." *Hutcherson*, 342 Ill. App. 3d at 121. We do not find the clause in this case to be substantively unconscionable.

¶ 85    There was no surprise to the parties, as the plaintiffs had 60 days to review the clause and opt out. See *Kinkel*, 223 Ill. 2d at 41 (observing that contract terms will not be found to be unconscionable if plaintiff has had a meaningful opportunity to reject the contract term). The clause also contained mutual promises to arbitrate, as either party could submit a dispute to arbitration, and Alliant designated itself as responsible for reimbursement related to filing, case management, administration, and fees, provided the claim was not frivolous or baseless. See *All-American Roofing, Inc.*, 404 Ill. App. 3d at 438 (mutual promise to arbitrate is sufficient, with no

requirement that that the contracting parties exchange equivalent values); *Hutcherson*, 342 Ill. App. 3d at 122 (cost of claimant submitting a nonfrivolous claim to arbitration is minimal); compare *Kinkel*, 223 Ill. 2d at 27 (arbitration agreement provided no terms regarding responsibility of costs of arbitration, and only stated that such information was available upon request). Further, either party was responsible for its own attorney fees, although attorney fees could be awarded by the arbitrator.

¶ 86 Plaintiffs' claims that the arbitration agreement is "one-sided" and "oppressive" relates to the effects of the clause on other agreements, which we have already determined to be valid as the 2019 Membership Agreement governs a broad range of services and accounts offered by the credit union. Although plaintiffs characterize the actual terms of the arbitration process as "difficult" and "impossible to navigate," we do not read the clause the same way as it provides a straight-forward summary from submission of the claim to review of the arbitrator's decision by a neutral panel. To plaintiffs' point that "no standards" are given for how the process is conducted, we note that the arbitration clause incorporates the rules and procedures of two arbitration and mediation associations, which govern the more precise questions of the actual process, depending on which organization the party seeking arbitration selects.

¶ 87 Having found that there is a valid agreement to arbitrate and that both the loan agreement and debt plan fall within the scope of the clause, we find that the circuit court erred in denying Alliant's motion to compel. The matter should be referred to arbitration, where plaintiffs are free to raise any objections to the clause or business practices of Alliant.

¶ 88                                III. CONCLUSION

¶ 89     For the reasons stated, we reverse the judgment of the circuit court. The case is remanded to the circuit court for the entry of an order staying the plaintiffs' case pending disposition of the arbitration proceedings.

¶ 90     Reversed and remanded.